**NATIONAL LABOR RELATIONS BOARD v. EXPRESS PUB. CO.**

No. 9408.

Circuit Court of Appeals, Fifth Circuit.

June 12, 1942.

Robert B. Watts, General Counsel, National Labor Relations' Board, Malcolm F. Halliday, Asst. General Counsel, National Labor Relations Board, and Gerhard P. Van Arkel and Joseph F. Castiello, Attys., National Labor Relations Board, all of Washington, D. C., for petitioner, National Labor Relations Board.

Leroy G. Denman and Leroy G. Denman, Jr., both of San Antonio, Tex., for respondent.

Before FOSTER, HOLMES, and McCORD, Circuit Judges.

McCORD, Circuit Judge.

This is a proceeding in contempt to compel the Express Publishing Company of San Antonio, Texas, publishers of the Morning Express and Evening News, to comply with the judgment of this court ordering the company (1) to cease and desist from: "Refusing to bargain collectively with the San Antonio Newspaper Guild as the exclusive representative of the city editors" and other employees in the editorial department; and (2) upon request bargain collectively with the Guild as the exclusive representative of its city editors and other editorial employees "with respect to rates of pay, hours of employment, and other conditions of employment, and if an understanding is reached in such matters, embody said understanding in a signed agreement, if requested to do so by the Guild." Our original opinion was handed down on May 7, 1940, and rehearing was denied June 17, 1940, 5 Cir., 111 F.2d 588. On March 3, 1941, the Supreme Court issued its judgment directing modifications of this Court's judgment, which modifications are not important in this proceeding. 312 U.S. 426, 61 S.Ct. 693, 85 L.Ed. 930. The provisions of our judgment requiring good faith bargaining have been in full force and effect at all times here material.

The allegations of the Board's petition for contempt are based on reports of four meetings between representatives of Express Publishing Company and the Guild held in April, 1941.

On April 7, 1941, the parties met to discuss the terms of a contract. The company voiced the opinion that the hours and rates of pay might be controlled by orders of the Wage and Hours Division of the United States Department of Labor. Nothing came of this meeting respecting a contract, but the representatives of the company offered to present a proposed contract if the Guild desired it to do so. To this, a representative of the Guild stated the company could wait until the Guild should submit another contract.

A second meeting was held on April 14, 1941. At that time the Guild presented another contract. It provided that the company should require as a condition of employment that an employee be and remain a member of the Guild in good standing during the term of his employment. If not a member at the time of signing the agreement, he should become a member of the Guild within thirty days of the date of its signing, or within thirty days of his becoming an employee of the company; and that there should be no discrimination against any employee because of membership or activity in the Guild. That if the company should find it necessary to fill vacancies or required additional employees it should apply to the Guild to supply a candidate or candidates for such positions. It provided that employees who left their positions for service in the armed forces of the United States should receive full salary during the period of such service, less any compensation paid by the government, and for their reinstatement to their same positions immediately upon their return, with severance pay, rating, and other rights under the agreement unimpaired. It provided there should be no discharges except for just and sufficient cause, and in the event any discharge was contemplated, the Guild should be notified two weeks in advance, with the right to consult with the publisher. It provided that the employees should not be required to handle struck work or work destined for struck departments of shops. It further provided that the company set aside a desk adjacent to the paymaster's cage on pay days for the voluntary collection of dues and assessments.

It provided a schedule of minimum salaries with increases from time to time, according to experience; that if at the ef-

fective date of the contract the salary of any employee was not increased by five per cent through application of the minimum salary provisions, it should be so increased; and that there should be no pay cuts. It further provided for a five day, forty hour week, the working day to consist of eight hours, falling within nine consecutive hours, with pay for overtime at the rate of time and a half in cash; for annual vacations, with full pay, of one week after six months service, two weeks after one years service, and three weeks after five years service; for sick leave with full pay, in accordance with the present practice of the company, and for a maternity leave of six months; for severance pay on dismissal, in the event of death to be paid to his beneficiary; and for a standing committee of the Guild of its own chosing to consult with the company and settle disputes.

This proposed contract was not acceptable to the company and the company was asked by a representative of the Guild to submit a proposal by mail, in order that the Guild's representatives might have time to study it. This was done. Another meeting was held between the parties on April 21st. The representative of the Guild stated that the Guild flatly rejected the counter proposal, on the ground that it indicated that the company had no intention to bargain in good faith with the Guild; and further stated that because of its utter disregard for the rights of labor, the action of the company would be immediately reported to the Regional Director of the National Labor Relations Board, with the request that the Board instantly initiate contempt proceedings.

The agreement submitted by the Express Publishing Company announced that it was the company's intention to pursue its long time and present policies in the matter of hiring employees in its news departments, fixing salaries and granting increases in salaries, allowing vacations and sick leaves within reasonable bounds, rewarding employees for loyalty and efficient service, when and as business conditions would allow, and discharging them when in its judgment such action was proper and necessary; and that it would retain complete freedom of action in such matters, with power to employ and discharge and make changes in salaries at any time, either with or without notice, as it might deem best, except that it should and would not

discriminate in any manner on account of Union activities, or as between members of the Guild and non-members of the Guild. A clause in the proposed agreement stated that after the World War the company upon request reemployed all employees who left their employment to serve in the armed forces of the United States, and that it was the intention of the company to continue that policy providing the company was in a position to do so. Other points touched upon in both proposals are subordinate and immaterial. No agreement was reached on any point at this meeting and at a fourth meeting held on April 29, 1941, the result was the same, neither side having in the meantime submitted any further proposals. When this final meeting adjourned the management of the company offered to meet with Guild representatives at any time upon request for further negotiations stating, "We will be glad to give it at any time."

The only question presented for decision is whether the company endeavored to bargain in good faith with respect to rates of pay, hours of employment and other conditions of employment in conformity to the judgment. In deciding that question we are entitled to draw our own conclusions from the facts in the record.

The publication of a daily newspaper is a business peculiar to itself. It is readily apparent that editorial writers and reporters must be loyal to the paper and competent to carry out its policies. The company could not be compelled to employ anyone in its editorial department who was incompetent or unwilling to conform to the policies of the paper. The company would have the right to discharge any employee not conforming to its policies, and could not be required to permit the Guild to have any voice in its employment of anyone to take his place or to add to the staff.

■ The law requires good faith bargaining with the purpose of reaching an agreement. National Labor Relations Board v. Whittier Mills Co. et al., 5 Cir., 123 F.2d 725. The obligation to bargain in good faith also rested upon the Guild as well as on the company.

■ The proposed contract submitted by the Guild was in several respects unreasonable; for example, the law did not require the company to agree to a closed shop or to assist in the collection of union dues. The company was not required by law to give two weeks notice before dis-

charging an incompetent employee, nor was it required to consult with the Guild as to his replacement. The obligation resting upon the company was not to discharge an employee for union activities or advocacy of collective bargaining. Associated Press v. National Labor Relations Board, 301 U.S. 103, 57 S.Ct. 650, 81 L.Ed. 953. Editors and reporters and other members of the editorial staff of the newspaper are of the intelligentsia and it must be assumed that they knew that various provisions of the proposed contract would be unacceptable to the company. The negotiations were broken off abruptly by the Guild, clearly with the intention of compelling the acceptance of its proposed contract by coercion.

A subordinate issue is whether the rates of pay and hours of work should be adopted even if both parties were in accord. The case of the Daily News was pending before this court. Fleming, Administrator, v. A. H. Belo Corporation, 5 Cir., 121 F.2d 207, certiorari granted 314 U.S. 601, 62 S.Ct. 137, 86 L.Ed. ——. We have delayed rendering our opinion in this case pending decision of the Belo case by the Supreme Court, so that the parties might be better advised as to the kind of wages and hours contract which may or may not be entered into, in keeping with the Fair Labor Standards Act of 1938, 29 U.S.C.A. § 201 et seq. The Belo case has now been decided, Walling v. A. H. Belo Corp., June 8, 1942, 62 S.Ct. 1223, 86 L.Ed. ——.

The allegations of contempt are not sustained by the proof. No case for contempt being made out, the petition is dismissed and the respondent stands discharged.