### SUPERIOR ENGRAVING CO. v. NATIONAL LABOR RELATIONS BOARD.

No. 9920.

United States Court of Appeals
Seventh Circuit.

June 27, 1950.

As Modified on Denial of Rehearing
Aug. 31, 1950.

7. Bumpass v. Bond, 131 Tex. 266, 114 S.W.2d 1172.

8. Compare Shroff v. Deaton, Tex.Civ.App., 220 S.W.2d 489.

George B. Christensen, Chicago, Ill., Otto A. Jaburek, Edward J. Wendrow, Keehn Landis, Chicago, Ill., Winston, Strawn, Shaw & Black, Chicago, Ill., of Counsel, for petitioner.

Joseph M. Jacobs, Alfred Kamin, Chicago, Ill., for intervenor.

David P. Findling, Associate General Counsel, A. Norman Somers, Assistant General Counsel, Dominick L. Manoli, Attorney, National Labor Relations Board, Washington, D. C., Abraham H. Maller, Attorney, National Labor Relations Board, Washington, D. C., for respondent.

Before DUFFY, LINDLEY and SWAIM, Circuit Judges.

LINDLEY, Circuit Judge.

This is a petition to review and set aside a decision of the National Labor Relations Board finding petitioner guilty of violating Sections 8(1), 8(2), and 8(5) of the original National Labor Relations Act, 49 Stat. 452, 29 U.S.C.A. § 158(1, 2, 5), and ordering petitioner to recognize, as the exclusive collective bargaining agent of its employees, Chicago Photo-Engravers' Union No. 5, hereinafter referred to as the Union. The Board's answer requests enforcement.

In a consent election held October 11, 1943, 23 of the 36 men then employed by petitioner voted in favor of the Union; thereupon petitioner recognized and entered into a collective bargaining relationship with the Union. At the first bargaining session, petitioner and the Union reached a tentative agreement with respect to all terms of a contract except expiration date, Union security provision, double time pay, inclusion of apprentices, and grievance procedure. The chief dispute revolved about the Union's demand for a closed shop. Following the second session, at which no further progress was made, petitioner contends, and the Trial Examiner found, that the Union instructed petitioner's employees to institute a slow-down and to refuse to work overtime; the Board, however, while apparently recognizing existence of a slow-down, set aside as "clearly erroneous" the Trial Examiner's finding that it was Union-inspired, and found, further, that there was no concerted refusal to work overtime. After a third session had ended in failure to agree, the Union, on November 18, 1943, announced that an impasse had been reached and, on the following day, filed an unfair labor practice charge against petitioner, alleging violations of Sections 8(1) and 8(3) of the Act. This charge was docketed as Case No. 13-C-2281. On December 6, 1943, petitioner and the Union met with a United States Conciliation Commissioner, but his efforts to settle the parties' disputes having proved unavailing, on March 4, 1944, the controversy was certified to the War Labor Board.

With respect to the events which occurred in the period between the Union's announcement that an impasse had been reached and the date of certification of the dispute to the War Labor Board, the record is replete with conflicting evidence. That Gruber, the Union's president, did, on December 2, 1943, mail to petitioner's competitors a list of its customers, with a suggestion that they "might be solicited," is definitely established. It is also undisputed that, between December 24, 1943, and March, 1944, 19 of petitioner's employees quit their jobs. Petitioner contended that they did so at direction of the Union and that the latter thus destroyed its own majority, but the Trial Examiner, excluding as hearsay the testimony of petitioner's president, Conforti, that nine of the men told him they were leaving because of Union instructions, credited the testimony of several of the employees themselves that they had left to take better paying jobs, and concluded that the Union had not ordered any mass withdrawal of petitioner's employees. It is clear, too, that, in early February, 1944, Conforti bought for

Joe Busse, an employee who subsequently spearheaded a drive to form an independent union among petitioner's employees, an $80 suit of clothing and that he gave to Busse, in a series of installments over a period of approximately one year extending into 1945, some $500 in war bonds. Conforti testified that Busse, though a drunkard, was a good worker when sober, and that he bought the clothes in order to keep Busse on the job and cheer him up and that he, Conforti, promised Busse the war bonds if he would remain sober, but both the Examiner and the Board credited the testimony of Busse to the effect that the bonds and the clothing were given him in consideration of his opposing the Union and taking the lead in establishing the Independent.

In the period during which the contract dispute was pending before the War Labor Board, petitioner and the Independent, together, filed with NLRB a total of five representation petitions, all averring that the Union had lost its majority among petitioner's employees. Each of these petitions was dismissed, the Board taking the position that the Union, by the submission of the dispute to the War Labor Board, had been deprived of a reasonable opportunity to bargain, and that the Union's prior certification and the pendency of the War Labor Board case constituted a bar to any new representation proceedings. The Board also, on March 27, 1945, decided Case No. 13-C-2281, finding that petitioner had been guilty of an unfair labor practice in dominating a then defunct organization which, during its existence from 1937 to June, 1943, had been known as the Engravers Guild; the Board, however, stating that, "In view of the present state of the record, we are unable to make any findings with respect to the allegations" that petitioner, "from on and after about June, 1943," violated Section 8(1) of the Act by reason of certain anti-union statements and conduct of its president, Conforti, dismissed the complaint as to that charge.

On May 17, 1945, the Regional War Labor Board, reviewing a series of panel hearings and intermediate reports and recommendations from which both petitioner and the Union had appealed, issued its "Directive Order" deciding the contract dispute and ordering that the closed shop provision demanded by the Union be incorporated in the collective bargaining agreement. The company's petition for review was denied by the War Labor Board on October 18, 1945, and the Union, on November 10, submitted to petitioner a proposed contract incorporating the clauses on which the parties had tentatively agreed prior to December 6, 1943, and those referred to in the War Labor Board's Directive Order. When petitioner failed to make any response thereto, the Union instituted the proceedings which culminated in the order now before this court.

The first unfair labor charge, filed by the Union on January 28, 1946, averred, in substance, that the petitioner had violated Sections 8(1) and 8(5) of the Act in that it had refused to put into effect or reduce to writing certain terms and conditions of employment agreed to by it and had refused to accept or to carry into execution the provisions of the War Labor Board's Directive Order of October 18, 1945. The first amended charge, filed August 12, 1947, alleged that petitioner had engaged in unfair labor practices in refusing to meet in collective bargaining conferences with the Union when requested to do so in November, 1945, and at various times thereafter, and in unilaterally granting wage increases to its employees, on or about January, 1946, and thereafter. The Board's complaint, incorporating the Union's charges, was filed on August 13, 1947, and petitioner, which had, subsequent to the filing of the Union's first unfair practices charge, filed a decertification petition which was denied by the Board on July 9, 1946, filed its answer denying that it was under any obligation to bargain with the Union, due to the fact that the Union had, by its own acts, lost its status as exclusive bargaining representative of the employees.

After the hearing had been in progress for some time, a second amended charge was filed by the Union, February 13, 1948, charging that petitioner had, in addition to committing the unfair practices specified

in the earlier charges, violated the Act by supporting a company-dominated Independent, by interrogating employees concerning their membership in the Union and promising them benefits if they would refuse to join or would withdraw from it, by causing and permitting the circulation of various anti-Union petitions on company time and property, and by discriminatorily discharging one Charles Burger. These acts, it was charged, had occurred "since on or about October, 1943." The Board's complaint was amended, over petitioner's objection, to incorporate these averments, and petitioner's answer thereto was filed February 23, 1948.

Subsequent to the hearing, which was held on various dates from January 20 through April 1, 1948, the Examiner issued his Intermediate Report finding that petitioner, on November 10, 1945, and thereafter, had unlawfully refused to bargain with the Union in violation of Section 8 (5) of the Act, and that, by making gifts to Busse to encourage formation of the Independent and by interfering with its employees in the exercise of the rights granted them by the Act, it had violated Section 8(1). The Examiner recommended that petitioner be required to bargain with the Union. Exceptions to the Intermediate Report were filed with and argued before the Board, which, by order of April 28, 1949, adopted the recommendations of the Examiner and ordered petitioner to cease and desist from (1) refusing to bargain with the Union, (2) dominating or recognizing the Independent or any successor thereto, (3) making gifts to influence its employees in their attitude toward the Union, or (4) otherwise interfering with, restraining or coercing its employees in the exercise of the rights guaranteed them by the Act. The company's petition to reconsider having been denied, this petition to review was filed.

It is the position of petitioner that the Board's order is predicated on certain allegedly unfair labor practices, specified in the Union's second amended charge and embodied in the Board's amended complaint, which occurred, if at all, in the years 1943–1945; this fact, argues the petition-

er, renders the Board's decision invalid, for the Labor-Management Relations Act of 1947, 29 U.S.C.A. § 160(b), expressly provides that, on and after the Act's effective date, August 22, 1947, "no complaint shall issue based upon any unfair labor practice occurring more than six months prior to the filing of the charge with the Board," which provision, it is urged, deprived the Board of jurisdiction to amend its complaint so as to include the unfair practices complained of in the Union's second amended charge, filed after the effective date of the Act. The Board contends, however, that a charge filed within six months of the effective date of the Act satisfies the requirements of Section 10(b).

The Board's contention that the six month limitation period provided for in Section 10(b) began to run from the effective date of the Act has found judicial sanction in the Fourth and Fifth Circuits. In Joanna Cotton Mills v. N.L.R.B., 176 F.2d 749, 754, the Court of Appeals for the Fourth Circuit stated, "We agree that the six months * * * runs from the date when the statute became effective." The Fifth Circuit Court arrived at the same conclusion in N.L.R.B. v. Itasca Cotton Mfg. Co., 179 F.2d 504, 506, the court stating that "there being no applicable statute of limitations in force when the proviso was enacted, the time * * * would not run out until six months after the statute took effect." These decisions are bottomed on the well-settled rule, expressed in such cases as Sohn v. Waterson, 17 Wall. 596, 599, 600, 21 L.Ed. 737, and U. S. v. Morena, 245 U.S. 392, 38 S. Ct. 151, 62 L.Ed. 359, that where a statute creates a period of limitations where none had previously existed, the period will begin to run with respect to preexisting claims, on the effective date of the statute. This rule was adopted, as the Supreme Court observed in Sohn v. Waterson, 17 Wall. 596, 599, 21 L.Ed. 737, "to give the statute a construction that will enable it to stand," since it was thought that to construe a limitations statute as absolutely barring all actions which had accrued more than the limited time before the statute was passed would render it unconsti-

tutional. Here, however, the result which this rule was designed to avoid would not have obtained in any event, for the Labor-Management Relations Act of 1947, Title I, Section 104, 29 U.S.C.A. § 151 note, expressly provided that "The amendments made by this title shall take effect sixty days after the date of the enactment of this Act * * *."[1] The inclusion of this provision in the Act not only avoids the result which the rule of Sohn v. Waterson was designed to avoid, but also indicates, we think, an intention, on the part of the Congress, that preexisting unfair labor practices, some of which would have been absolutely barred as grounds for the issuance of a Board complaint had the six month limitation period for the filing of unfair labor practice charges been given immediate retroactive effect, were to be kept alive during the sixty day period until the Act became operative but that, once that sixty day period had expired, the six month limitation would be effective as to all unfair labor practice charges filed thereafter. Strengthening this conclusion is the fact that the only exception provided for in the statute is the case where the person aggrieved by an unfair labor practice is prevented, by reason of service in the armed forces, from filing a charge within the statutory period. The express statement of this exception would seem to preclude the existence of any exception with respect to charges based on past unfair labor practices. *Expressio unius est exclusio alterius.* Consequently, we conclude that the decisions relied on by the Board are in error and that petitioner is correct in contending that, of the unfair

practices with which petitioner is charged in the Union's second amended charge, those which occurred more than six months prior to the filing of the charge were wrongfully embodied in the complaint.[2]

■ Examining the second amended charge in the light of our conclusion that the limitations period was operative with respect to all charges filed after the Act's effective date, it is evident that the allegations therein concerning petitioner's interrogation of its employees and its promises of benefits to such of them as would refuse to join or would withdraw from the Union, these acts having occurred "since on or about October, 1943," could not serve as the basis for the issuance of an unfair labor practice complaint in February, 1948, the date of the amendment of the Board's complaint herein.[3] However, the amendment embodying the Union's charge that petitioner unilaterally granted wage increases to its employees "on or about January, 1946, and *continuously* thereafter *to the date hereof*" (Emphasis supplied) was properly made, and the granting of such increases, which is admitted by petitioner, is sufficient to support a finding that petitioner violated Section 8(1) and 8(5) of the Act, provided it was, during the period in which the wage increases were granted, obligated to bargain with the Union as the exclusive representative of its employees. May Department Stores Co. v. N.L.R.B., 326 U.S. 376, 384, 385, 66 S.Ct. 203, 90 L.Ed. 145; N.L.R.B. v. Crompton-Highland Mills, 337 U.S. 217, 69 S.Ct. 960, 93 L.Ed. 1320.

■ As to the averment that petitioner dominated the formation of the Independ-

---

1. It might also be observed that the rule of construction established by such cases as Sohn v. Waterson is applicable only to limitation statutes affecting private as distinguished from public rights, and that the National Labor Relations Act creates no private, vested rights, but only public rights which are at all times subject to the control of the legislature. National Licorice Co. v. N. L. R. B., 309 U.S. 350, 362–364, 60 S.Ct. 569, 84 L. Ed. 451.

2. Since the original charge and the first amended charge were filed prior to the

effective date of the 1947 amendment, there is no question that the unfair labor practices alleged therein were properly incorporated in the Board's complaint.

3. The allegation that these practices had occurred "*since* on or about October, 1943" (Emphasis supplied,) might be construed as an allegation that they were continuing unfair labor practices still being engaged in by petitioner, but the evidence offered in support of the allegation was restricted to events in the years 1943–45, none of which would support a Board complaint in 1948.

-ent and thereafter contributed support to it, it seems clear that, while its alleged role in the formation of the Independent in the spring and summer of 1944 could not be sound basis for issuance of a Board complaint in 1948, its continued support of the Independent, if carried on up to a date within six months of the filing of the Union's second amended charge, would justify a complaint and would, if proved, support a finding of violation of Section 8(2). But here, as was the case with respect to the averment of employer interrogation of its employees, there is no evidence to support a finding that petitioner's alleged domination or support of the Independent extended into the six month period prior to the filing of the charge. This does not mean, however, that the Board, though it could not make petitioner's role in the formation of the Independent the subject of an independent unfair labor practice complaint, could not consider that role as evidence of a violation of petitioner's duty, under Section 8(5), to bargain collectively with the Union, assuming, of course, that it was under such an obligation. N.L.R.B. v. Ellis-Klatscher & Co., 9 Cir., 142 F.2d 356, 358, 359; N.L.R.B. v. Sunshine Mining Co., 9 Cir., 110 F.2d 780.

 Petitioner strenuously argues that the Board's factual and credibility determinations, especially those relating to the petitioner's alleged role in the formation of the Independent, are not supported by substantial evidence on the record considered as a whole, but are arbitrary and capricious.[4] It is urged, in support of this contention, that this court's conclusion that Section 10(e) of the amended Act did not materially enlarge the scope of judicial review of the Board's findings of fact, see N.L.R.B. v. LaSalle Steel Co., 7 Cir., 178 F.2d 829, 834, overlooks the effect of

the amendment of Sections 10(b) and 10 (c), which sections require the Board to conduct its proceedings in accordance with the rules of evidence applicable in the district courts and to base its findings upon the preponderance of the evidence received in the course of such proceedings. Obviously, if the Board acted in utter disregard of the directions contained in those two sections, an enforcement court would set aside its order as arbitrary, but, so long as the proceedings before the Board have been conducted in conformity with the statutory directions, a court of review must, under the provisions of Section 10(e) of the Act, regard the Board's findings of fact as conclusive if supported by substantial evidence on the record considered as a whole. This court has, on several occasions, announced and reiterated its firm conviction that, in resolving this question, it is not empowered to try the case de novo, to judge of the credibility of witnesses, or to weigh the evidence which was before the Board, but that it is limited to determination of whether there is, on the entire record, substantial and adequate evidence to support the Board's findings. N.L.R.B. v. Austin Co., 7 Cir., 165 F.2d 592, 595; N.L.R.B. v. LaSalle Steel Co., 7 Cir., 178 F.2d 829, 834; N.L.R.B. v. Kropp Forge Co., 7 Cir., 178 F.2d 822, 826.

 Turning to petitioner's assertion that the court should set aside the Board's finding that petitioner dominated, interfered with and contributed support to the Independent, it seems clear that, if the testimony of petitioner's ex-employee, Joe Busse, is credited, the Board's finding is conclusive upon this court. Petitioner charges that the finding is based on a "one-man case" and that the Board acted arbitrarily in crediting the testimony of Busse, a drunkard and a perjurer, rather than that

4. Petitioner's contention that the acts of which it is found guilty in the instant case are the very acts as to which it was found not guilty in Case No. 13-C-2281 is without merit. In the earlier case, the charge was that petitioner had dominated a labor organization known as the Engraver's Guild, had interrogated employees concerning their membership in the charging Union and the activities of said Union, and had generally disparaged the Union and its objectives. Only the allegation concerning employee interrogation is common to both cases and, as has been observed, that allegation was not properly incorporated in the amended complaint in the instant case because of the bar imposed by the six month limitation period in Section 10(b) of the Act.

of Conforti, petitioner's president. It is readily apparent, however, that the Board, forced to choose between the mutually exclusive stories of Busse and Conforti, was compelled, in any event, to accept the testimony of only one of the two men. Moreover, both the Examiner and the Board were careful to point out that Busse's testimony in regard to this matter was credited because it was so supported by the attendant circumstances, i. e., the gifts of clothing and war bonds which were made to Busse by Conforti, as to be convincing. Remembering that it is for the Board to determine the credibility of witnesses, we think we can not say that the Board's finding is without substantial evidentiary support in the record, considered as a whole.

As has been noted, the crucial issue in this case is whether petitioner was, in fact, under the duty to bargain with the Union as the exclusive representative of its employees, for, absent such a duty, neither its refusal to bargain nor its unilateral grant of wage increases would constitute an unfair labor practice. It is clear that, as a result of the Union's victory in the 1943 consent election, petitioner was obligated to bargain with the Union, as the exclusive representative of its employees, for a reasonable period of time, Franks Bros. Co. v. N.L.R.B., 321 U.S. 702, 705, 64 S.Ct. 817, 88 L.Ed. 1020; N.L.R.B. v. Appalachian Electric Co., 4 Cir., 140 F.2d 217, 220–222; N.L.R.B. v. Century Oxford Mfg. Co., 2 Cir., 140 F. 2d 541, certiorari denied 323 U.S. 714, 65 S.Ct. 40, 89 L.Ed. 574, exclusive of the period during which the contract dispute was pending before the War Labor Board, Allis-Chalmers Mfg. Co., 50 NLRB 306, N.L.R.B. v. Gatke Corp., 7 Cir., 162 F.2d 252. It is equally clear that petitioner has refused to bargain with the Union,[5] basing its refusal on its conviction that the Un-

ion had lost its status as representative of the majority of its employees. A Union loss of majority, however, if attributable to an unfair labor practice on the part of petitioner or a change of personnel occurring in the normal course of business, would not relieve petitioner of its duty to bargain with the Union, Medo Photo Supply Corp. v. N.L.R.B., 321 U. S. 678, 687, 64 S.Ct. 830, 88 L.Ed. 1007; Franks Bros. Co. v. N.L.R.B., 321 U.S. 702, 703, 704, 64 S.Ct. 817. Consequently petitioner sought to show that the Union had lost its majority by its own action in withdrawing its members from petitioner's employ. But the Examiner excluded, as hearsay, the testimony of petitioner's president that certain of the men, when they left petitioner's employ, informed him they were leaving at the direction of the Union. The exclusion of this testimony, urged by petitioner as prejudicial error, we think was entirely proper, for, while Conforti's testimony might have been admissible to show that the statements had, in fact, been made, the Examiner was correct in holding that, with respect to the purpose for which it was offered, i. e., to show that the Union had, in fact, ordered a withdrawal of its members from petitioner's employ, the testimony was hearsay and, as such, inadmissible. Buckeye Powder Co. v. DuPont Powder Co., 248 U.S. 55, 65, 39 S.Ct. 38, 63 L.Ed. 123. Nor is there merit in petitioner's suggestion that the testimony was admissible on the theory that the statements of the individuals were binding on the Union. U. S. v. White, 322 U.S. 694, 701, 702, 64 S.Ct. 1248, 88 L.Ed. 1542, 152 A.L.R. 1202.

The Board, finding no evidence in the record to indicate that the Union withdrew its members from petitioner's employ, presumed that the loss of majority was due to petitioner's unfair labor practices. In view of the requirement in Sec-

---

5. Petitioner has asserted that the Board's finding that the first refusal to bargain occurred in March, 1944, exceeded its jurisdiction, the complaint having alleged only that petitioner refused to bargain "on or about November 10, 1945, May 20, 1946, and July 18, 1946, and at all times after these dates," but it seems clear that, regardless of whether the first refusal to bargain occurred in 1944 or 1945, such refusal was a violation of Section 8(5) unless petitioner had, by the conduct of the Union, been relieved of its duty to bargain.

tion 10(c) of the Act, as amended, that the Board's findings must be based upon the preponderance of the testimony taken, it seems clear that the Board erred in conclusively presuming that the loss of majority was caused by petitioner's unfair labor practices, for, as the Examiner pointed out, all the men who were called as witnesses testified that they left for better paying jobs or to enter military service. Their testimony, however, is of no benefit to petitioner, for it indicates merely that the Union's loss of majority was due to a turnover in personnel, which, it has been held, is not such a change in circumstances as would relieve petitioner of its obligation to bargain with the Union. Franks Bros. Co. v. N.L.R.B., 321 U.S. 702, 703, 704, 64 S.Ct. 817, 88 L.Ed. 1020; N.L.R.B. v. Andrew Jergens Co., 9 Cir., 175 F.2d 130, 134, certiorari denied 338 U.S. 827, 70 S.Ct. 76.

 It is contended that the so-called Allis-Chalmers doctrine should not be applied in this case because the Union did not, so petitioner says, bargain in good faith but resorted to coercive measures of self-help which freed petitioner of its duty to bargain further with it. But the findings of the Board, supported by substantial evidence on the record considered as a whole, are to the effect that the Union did not order a withdrawal of its members from petitioner's employ, and that it was not responsible for the alleged slow-down and refusal to work overtime. Thus, there remains only the letter written by the Union's president to petitioner's competitors, listing certain accounts of petitioner which "might be solicited" and the names of two of petitioner's salesmen who "should be encouraged to join with one of our union plants." [6] The fact is, however, that petitioner, though now urging that the Union's circulation of the letter relieved it of its duty to bargain with the Union, did not so regard it at the time the act occurred, for it continued to deal with the Union as the exclusive bargaining representative of its employees in the subsequent meetings with the Conciliation Commissioner and in the submission of the contract dispute to the War Labor Board. Moreover, there is no evidence indicating that the Union, in certifying the dispute to the War Labor Board, was not acting in good faith, or that, while the case was pending before that body, it employed any self-help measures, while on the other hand, there is abundant evidence that petitioner, in the same period, sought to replace the Union as the representative of its employees. Consequently, we conclude that petitioner's contention must be rejected.

 Petitioner's final argument is that the Board's order should be set aside because it does not effectuate the policies of the Act. This contention arises out of the fact that, although only 10 of the 77 men currently employed by petitioner were employed by it in 1943, when the consent election was held, the Board's order will saddle the remaining 67 men with a bargaining representative with respect to which they have had no opportunity to vote, for or against. Petitioner contends that such a result is a perversion of the purposes of the statute, and insists that the policies of the Act would best be effectuated by an order requiring a new election to determine what union, if any, its employees desire to represent them. The Supreme Court, however, has indicated that it is for the Board, not the courts, to determine how the effect of prior unfair labor practices is to be expunged, International Association of Machinists v. N.L.R.B., 311 U.S. 72, 82, 61 S.Ct. 83, 85 L.Ed. 50, and, more particularly, that the question of whether an employer should be required to bargain with a particular union previously selected by its employees or whether, in view of lapse of time and changed conditions, a new election should be held, is one for the Board to decide, N.L.R.B. v. P. Lorillard Co., 314 U.S. 512, 513, 62 S.Ct. 397, 86 L.Ed. 380. Moreover, in the recent case of N.L.R.B. v. Mexia

---

6. The Board regarded this letter as such an insignificant form of self-help as to render unnecessary any decision by it upon the propriety of the Trial Examiner's

holding that the Allis-Chalmers doctrine applied even though the Union had resorted to self-help.

Textile Mills, U.S., 70 S.Ct. 826, 829, 833, the court stated: "That the respondent doubts the Union's ability to muster a majority of the employees in the bargaining unit does not justify the denial of an enforcement decree. Explicit congressional policy stands in the way of permitting the employers to stall enforcement of the Board's orders on this ground." It should also be observed that the bargaining relationship established by the Board's order is not a permanent one, Franks Bros. Co. v. N.L.R.B., 321 U.S. 702, 705, 64 S.Ct. 817, 88 L.Ed. 1020, and that, should the petitioner's employees, after the Union has been given a reasonable time in which to succeed as their bargaining representative, be dissatisfied with the Union, Section 9 (c) of the Act provides a procedure by which *they* can assert that the Union is no longer their representative. Consequently, it appearing that the Board's order is appropriate for present enforcement, judgment will enter enforcing it.[7]

## On Petition for Rehearing.

Petitioner has persistently contended that an employer cannot be guilty of a refusal to bargain if the Union is not itself bargaining in good faith. This is correct, but here we have no evidence that the Union, in submitting the dispute to the War Labor Board, was not acting in good faith. The cases relied on by petitioner, N.L.R.B. v. Express Publishing Co., 5 Cir., 128 F.2d 690; Matter of Times Publishing Co., 72 N.L.R.B. 676, do not hold that a Union's resort to self-help is conclusive evidence of a lack of good faith. Thus we think it could not properly be held that peaceful picketing, if carried on by a Union during a labor dispute, would relieve the employer of its duty to bargain with the Union. Nor do the cases cited persuade us that the Union's circulation of a letter to petitioner's competitors in December, 1943, constituted proof that it was not acting in good faith in certifying the dispute to the War Labor Board three months later, in March, 1944. Consequently, we conclude that the rejection of petitioner's contention that it was under no obligation to bargain with the Union was correct.

Petitioner strongly urges that the ex parte statements of individual employees as to why they left the employment was not hearsay and should have been admitted. We think, however, that our conclusion in this respect is correct. The Act, Section 10 (b), provides that the proceedings before the Board, so far as practicable, should be conducted "in accordance with the rules of evidence applicable in the district courts of the United States." The rule excluding hearsay is a basic rather than a technical rule. The reason for the rule is that the unsworn statement of a person not called as a witness or subjected to the test of cross-examination is not recognized as having sufficient probative effect to raise an inference that the fact is as stated. 31 C.J.S., Evidence, § 193, P. 924. Our conclusion that the excluded statements constituted hearsay is, we think, fortified by Buckeye Powder Co. v. DuPont Powder Co., 248 U.S. 55, 39 S.Ct. 38, 63 L.Ed. 123; Bracken et al. v. Cato et al., 5 Cir., 54 F.2d 457; Globe Indemnity Co. v. McAvoy Co., 7 Cir., 41 F.2d 122, certiorari denied 282 U.S. 884, 51 S.Ct. 87, 75 L.Ed. 780. A labor union is an association constituting an entity suable in the federal courts. United Mine Workers of America et al., v. Coronado Coal Company et al., 259 U.S. 344, at page 381, 42 S.Ct. 570, 66 L.Ed. 975, 27 A. L.R. 762. The Supreme Court said in United States v. White, 322 U.S. 694, at pages 701 and 702, 64 S.Ct. 1248, 1252, 88 L.Ed.

---

7. In view of our conclusion that, although those portions of the second amended charge dealing with petitioner's sponsorship of the Independent could not, because of the six month limitation period in the Taft-Hartley Act, properly support an unfair labor practices complaint, evidence relating thereto was admissible as *tending* to prove a refusal to bargain on petitioner's part, it does not follow that paragraphs 1(b) and 1(c) of the Board's order (requiring petitioner to cease and desist from dominating and interfering with, or contributing support to, or recognizing the Independent) or paragraph 2(b) thereof (requiring petitioner to disestablish the Independent) should be stricken, for these phases of the order are justified by the Board's findings and by the evidence.

1542, 152 A.L.R. 1202, that "The union's existence in fact, and for some purposes in law, is as perpetual as that of any corporation, not being dependent upon the life of any member. It normally operates under its own constitution, rules and by-laws which, in controversies between member and union, are often enforced by the courts. * * * The actions of one individual member no more bind the union than they bind another individual member unless there is proof that the union authorized or ratified the acts in question." It follows that the entity of the association is as much separate and apart from the individual members as that of a corporation is from its stockholders. Thus, in the absence of authority conferred, a single member has no power to bind the association by his declarations or statements. 7 C.J.S., Associations, §§ 20, 28, pp. 51, 52, 71 and 72; Spotswood v. Morris, 12 Idaho 360, 85 P. 1094, 6 L.R.A.,N.S., 665; 5 C.J. p. 1361, note 83; Sizer v. Daniels, 66 Barb., N.Y., 426; Edgerly v. Gardner, 9 Neb. 130, 1 N.W. 1004; Kuteman v. Lacy, Tex.Civ.App., 144 S.W. 1184. It follows, therefore, that the statements of individual members are not the statements of the association and, so far as that entity is concerned, are within clearly announced rules purely hearsay.

The petition for rehearing is denied.