WILSON & CO., Inc., v. NATIONAL LA-BOR RELATIONS BOARD.

No. 13356.

Circuit Court of Appeals, Eighth Circuit.

June 6, 1947.

Richard C. Winkler, of Chicago, Ill. (John L. Cockrill, of Chicago, Ill., on the brief), for petitioner.

Mozart G. Ratner, Attorney, National Labor Relations Board, of Washington, D. C. (Gerhard P. Van Arkel, Gen. Counsel, Morris P. Glushien, Associate Gen. Counsel, A. Norman Somers, Asst. Gen. Counsel, Joseph B. Robison and Arnold Ordman, Attys., National Labor Relations Board, all of Washington, D. C., on the brief), for respondent.

Before THOMAS, JOHNSEN, and RIDDICK, Circuit Judges.

THOMAS, Circuit Judge.

This case comes before the court upon petition of Wilson & Co., Inc., to review, and upon request of the National Labor Relations Board to enforce, the Board's decision of April 23, 1946, ordering the petitioner to cease and desist from violations of § 8(1) and (5) of the National Labor Relations Act, 49 Stat. 449, 29 U.S.C.A. § 151 et seq., at the Company's meat packing plant at Omaha, Nebraska, and to bargain collectively with the United Packinghouse Workers of America, Local 62, CIO, as the exclusive representative of its plant protection employees, sometimes called plant guards.

The petitioner contends:

1. That it has not refused to bargain within the meaning of the Act because (a) its plant guards, as a result of "militarization" and "deputization," are not "employees" but are public officers, and (b) that the plant guards have withdrawn from and are no longer represented by the union; and

2. That the union should not be recognized as a bargaining representative of the plant guards because affiliation of the guards with any union and particularly with the same union that represents the production and maintenance workers at the plant is contrary to public policy.

At the Omaha plant there are between 1300 and 1500 employees, of whom 15 are members of the plant protection force or guards. At and prior to the commencement of these proceedings Local 62 represented the production and maintenance and the restaurant employees as separate collective bargaining units.

On July 12, 1945, an election was held in a representative proceeding under § 9(c) of the Act, resulting in the choice of the union as bargaining agent for the plant protection employees also, and on July 25, 1945, the union was certified by the Board as their bargaining agent.

Some further facts are necessary to a clear understanding of petitioner's contentions in this court.

First. The plant guards were "militarized," that is, the members of the guard were made civilian auxiliaries to the United States Military Police on July 13, 1943, and their status as such continued until August 28, 1945. Civilian auxiliaries were created under a directive issued by the Secretary of War pursuant to authority of the President's Executive Order No. 8972 of December 12, 1941, 6 Fed.Reg. 6240. This was a war measure taken as a precaution for the protection of strategic premises and war materials. Civilian guards were thus militarized "to provide internal and external protection of the plant against sabotage, espionage, and natural hazards" and "to serve with the Army in providing protection to the plant and its environs in emergency situations." Circular No. 15 issued by the War Department.

Upon induction into the civilian auxiliary police the guards were required to sign an agreement that they would "support and defend the Constitution of the United States against all enemies, foreign and domestic"; that they would "bear true faith and allegiance to the Constitution of the United States"; and that they would faithfully discharge their duties as civilian auxiliaries to the military police to protect war material, war premises and war utilities against all enemies, foreign and domestic, and would obey any orders issued in connection therewith by the President.

Other pertinent regulations issued by the government provided that

"No conflicting interest of any kind will be permitted to interfere with the successful accomplishment of this mission."

"Basically, the militarization of plant guard forces does not change the existing systems of hiring, compensation, and dismissal; all remain primarily a matter between the guards and the plant management."

"The status of the employer in respect to the employee benefits for the guard force is not changed. For example, social security, workmen's compensation, and employer's liability provisions remain unaffected."

Another regulation urged the contracting parties in all labor agreements to include a provision "that for the duration of the war this agreement is in all respects subject to the provisions of the directives of the War Department concerning military organization of the plant guard forces." The regulation as amended further provided that

"(2) Auxiliary Military Police are permitted to bargain collectively, but no such activity will be tolerated which will interfere with their obligations as members of the Auxiliary Military Police. * * *

"(3) In the event that plant guards enrolled as Auxiliary Military Police desire to be represented in collective bargaining with the management, they should be represented by a bargaining unit other than that representing the production and maintenance workers. However, in such event, both bargaining units may be affiliated with the same trade union local, provided they are, in fact, separate bargaining units."

In spite of the regulations of the War Department, supra, petitioner refused to bargain with the separate certified guard unit on August 1 and 18, 1945. After the demilitarization of the plant guards on August 28, 1945, the petitioner again refused to bargain with the unit in December, 1945.

Second. Since sometime prior to the commencement of these proceedings the plant protection force, or guards, have been "deputized" as special deputy sheriffs of Douglas County, Nebraska, the county in which the plant is located, "to aid in their duties as watchmen while in the employ of Wilson & Co."

At all times during the period of militarization and of deputization the plant guards were subject to the orders of the military commander and of the Sheriff of Douglas County, Nebraska. However, they have at no time been called upon to do any act either as members of the military police or as deputy sheriffs. They have at all times been under the direction and supervision of the management. Hired through the employment office of the company, they are paid by the company. Their wages and working conditions are fixed and prescribed by the company. They are given plant seniority. As plant-protection employees, their duties are to require identification of persons entering the premises of the company, to protect the property of the company, to guard against thefts, to keep a look-out for fire hazards, to pull fireboxes, to report infractions of the plant rules, and to perform all the duties customarily performed by plant-protection employees. They can neither hire nor fire employees, although they may make recommendations in regard to hiring.

Third: Upon the hearing in this case petitioner introduced in evidence its exhibit No. 1 reading:

"Aug. 30, 1945, Omaha, Neb.

"The following named guards of the Wilson Inc. meat packing plant at 27 Y st. Omaha, Nebr. Do not desire that C.I.O.–P.W.O.C. union to represent us as the bargaining unit."

This exhibit dated two days after the guard was demilitarized and signed by 12 members thereof was deposited in the office of one of the managing officers of the petitioner within a day or two after August 30, 1945. But it was not brought to the attention of the union or of the Board until offered in evidence at the hearing in these proceedings before an examiner on January 29, 1946. The petitioner's contention is that the exhibit evidences the withdrawal of a majority of the plant guards from affiliation with the union elected as a bargaining agent by the plant-protection employees in the § 9(c) proceedings and certified by the Board on July 25, 1945.

■ We shall first consider the contention that plant guards are not employees. As a matter of law it is not true that the petitioner's plant-protection employees lost their status as "employees" under the Act by reason of militarization, or of deputization. The powers there given to them, among other things, strengthened their qualifications to protect their master's property. By express regulation of the government such powers did not destroy the relation of master and servant existing at the time the new functions were bestowed upon them. This court has held that to clothe a watchman appointed by a railroad company to guard its property with police power does not transform "in any way his relation to the company as an employee." Chicago & N. W. Ry. Co. v. McKenna, 8 Cir., 74 F.2d 155, 157. We can perceive no substantial distinction between the relation of a "militarized" plant guard and his employer and that of a "deputized" guard and his employer.

If any doubt existed as to whether the finding of the Board that militarized and deputized plant guards in the circumstances of this case are employees within the meaning of the Act is valid, that doubt has now been effectually removed by the decisions of the Supreme Court on May 19, 1947, in National Labor Relations Board v. E. C. Atkins & Co., 67 S.Ct. 1265, and National Labor Relations Board v. Jones & Laughlin Steel Corporation, 67 S.Ct. 1274. Both these points were presented in those cases and the findings and orders of the Board were sustained in each case.

■ The argument based upon exhibit No. 1, supra, that the plant guards have withdrawn from and are no longer represented by the union, can not be sustained. The Board refused to accept this exhibit as evidence of a loss of majority and a revocation of the designation of the union as bargaining agent for the certified unit as determined in the § 9(c) election of July 12, 1945. Introduced in evidence as a surprise, the exhibit had been kept in the possession of the petitioner's managing officers and its existence was unknown both to the Board and to the union. The petitioner made no claim in its pleadings or other-

wise to a loss of a majority. The Board concluded that the evidence so brought to its attention should not be accepted as of sufficient weight to overthrow and annul the result of a legally held secret election provided for by § 9 of the Act, and "that the petition [exhibit 1, supra] did not effectively withdraw the designation of the union as the bargaining representative of the respondent's plant-protection employees."

The conclusion of the Board on this point is reasonable and is warranted by both the law and the facts. The order can not be reversed for this reason.

■ It is further argued that "the functions and obligations" of the guards "are of a dual character." They have an obligation to their employer and also to the government and the state; and that in case of a strike of their fellow members of the union they would be subjected to the influence of opposing loyalties; that they might be called upon to protect the property of the petitioner against their comrades as well as the property of the government or of the community or of other members of the community at the same time. It is contended that the Board erred in failing to consider these incompatible duties imposed upon the guards.

The possibilities thus imagined are not impossible and they might occur; but they do not prove that the guards are not "employees" within the meaning of the Act or that they do not constitute a practical unit for collective bargaining. As said in Jones & Laughlin Steel Corp. v. National Labor Relations Board, 5 Cir., 146 F.2d 833, 835, certiorari denied, 325 U.S. 886, 65 S.Ct. 1575, 89 L.Ed. 2000, "The general fear that all classes of employees may make common cause in case of future disputes is always present because such co-operation is always possible." But these facts and fears do not except the guards from the benefits of the Act.

■ The petitioner next contends that the affiliation of the guards in the same union with the plant production and maintenance employees, even though they are in a separate bargaining unit, is contrary to public policy. This contention presents

an erroneous conception of the meaning of the term "public policy" and of the function of courts. In United States v. Trans-Missouri Freight Association, 166 U.S. 290, 340, 17 S.Ct. 540, 559, 41 L.Ed. 1007, the Supreme Court said:

"The public policy of the government is to be found in its statutes, and, when they have not directly spoken, then in the decisions of the courts and the constant practice of the government officials; but when the lawmaking power speaks upon a particular subject, over which it has constitutional power to legislate, public policy in such a case is what the statute enacts."

And in Julien v. Model Building, Loan and Investment Co., 116 Wis. 79, 92 N.W. 561, 565, 61 L.R.A. 668, the court held:

"While contracts may be void as being contrary to the policy of the law, statutes are never said to be contrary to 'public policy' in any other sense than contrary to constitutional policy." See 35 Words and Phrases, Perm.Ed. p. 280, 281.

■ A collective bargaining contract made pursuant to a constitutional statute can not be contrary to the public policy of the government. In § 1 of the National Labor Relations Act Congress has "declared [it] to be the policy of the United States to eliminate the causes of certain substantial obstructions to the free flow of commerce * * * by protecting the exercise by workers of full freedom of association, self-organization, *and designation of representatives of their own choosing*, for the purpose of negotiating the terms and conditions of their employment or other mutual aid or protection." (Italics supplied.)

And § 7 of the Act provides that "Employees shall have the right * * * to bargain collectively through representatives of their own choosing * * *."

■ The public policy of the United States does not, therefore, limit the choice of employees to any particular representation; nor does it exclude from their choice the representative of any other group of employees. The court is not at liberty to travel out of the record in order to ascertain what is against public policy. Vidal v. Girard's Executors, 2 How. 127, 43 U.S.

127, 197, 11 L.Ed. 205. The National Labor Relations Act has been held constitutional by the Supreme Court of the United States, and we are bound by its decisions. National Labor Relations Board v. Jones & Laughlin Steel Corp., 301 U.S. 1, 57 S. Ct. 615, 81 L.Ed. 893, 108 A.L.R. 1352; Consolidated Edison Co. v. National Labor Relations Board, 305 U.S. 197, 59 S.Ct. 206, 83 L.Ed. 126.

■ There is no doubt that the unfair labor practices involved have occurred both prior and subsequent to August 30, 1945. Under these circumstances the decision of the Board can not be disturbed or reversed by this court. Franks Bros. Co. v. National Labor Relations Board, 321 U.S. 702, 64 S.Ct. 817, 88 L.Ed. 1020; National Labor Relations Board v. P. Lorillard Co., 314 U.S. 512, 62 S.Ct. 397, 86 L.Ed. 380.

For the foregoing reasons the order of the Board will be enforced. An appropriate decree will, therefore, be entered.