## NATIONAL LABOR RELATIONS BOARD v. BROOKS.

### No. 13502.

United States Court of Appeals
Ninth Circuit.
May 14, 1953.

George J. Bott, General Counsel, David P. Findling, Associate General Counsel, A. Norman Somers, Asst. General Counsel, Frederick U. Reel and William J. Avrutis, Attorneys, National Labor Relations Board, Washington, D. C., for petitioner.

Carter & Potruch, Erwin Lerten, Los Angeles, Cal., for respondent.

Before MATHEWS, STEPHENS and BONE, Circuit Judges.

BONE, Circuit Judge.

This is a petition by the National Labor Relations Board for enforcement of the Board's order directing, among other things, that respondent bargain collectively with International Association of Machinists, District No. 27 (hereinafter called

"Union"). The order was issued after the usual proceedings under § 10 of the National Labor Relations Act, as amended, 29 U.S.C.A. § 141 et seq., in which the Board found that respondent had refused to bargain collectively with the Union, in violation of §§ 8(a) (1) and 8(a) (5) of the Act.[1]

Respondent resists enforcement upon three grounds: (1) that the Board does not have jurisdiction over the unfair labor practices charged; (2) that the Board's finding that respondent refused to bargain is not supported by substantial evidence on the record considered as a whole; and (3) that the Board's finding that at the time of the alleged refusal to bargain the Union represented a majority of the employees in the appropriate bargaining unit is not supported by substantial evidence on the record considered as a whole.

Respondent, an individual, sells Chrysler and Plymouth automobiles at Van Nuys, California, as a dealer under franchise from the Chrysler Corporation, which operates in California and other states. During the calendar year 1950 respondent purchased automobiles of a value in excess of $400,000 from the Chrysler Corporation. All of these automobiles were assembled, purchased, and sold within the State of California. Approximately 50 per cent of the parts going into the automobiles were shipped into California from outside the state.

On the question whether respondent is engaged in commerce within the meaning of the National Labor Relations Act, our very recent case of National Labor Relations Board v. Howell Chevrolet Company, 9 Cir., 204 F.2d 79, in which on facts almost identical to those involved in the case at bar we upheld the jurisdiction of the Board, is controlling. See also National Labor Relations Board v. Townsend, 9 Cir., 185 F.2d 378, certiorari denied 341 U.S. 909, 71 S.Ct. 621, 95 L.Ed. 1346; National Labor Relations Board v. Ken Rose Motors, 1 Cir., 193 F.2d 769.

The facts as to the alleged refusal of respondent to bargain with the Union are as follows. On April 12, 1951, the Board conducted a consent election among respondent's employees to determine whether the employees desired the Union to represent them in collective bargaining. Of the 15 employees in the concededly appropriate bargaining unit, eight voted for the Union. No objection to the election was filed and on April 20, 1951, the Regional Director certified the Union as the employees' bargaining representative.

On April 19, 1951, one week after the election and the day before the certification was issued, respondent, the Union and the Board each received by mail a sheet reading:

"April 18, 1951

"We the undersigned majority of the employees of Ray Brooks, Chrysler-Plymouth Dealer, 6530 Van Nuys Blvd., Van Nuys, Calif., are not in favor of being represented by Union Local No. 727 as a bargaining agent. We respectfully submit this petition for your consideration."

The purported signatures of nine of the 15 employees in the bargaining unit were appended beneath.

On April 27 a Union representative asked respondent for a conference to negotiate a collective bargaining contract. Respondent, by his counsel, replied by letter on May 1. In the letter respondent declared that he had been "given to under-

---

1. Section 8(a) (1) of the Act provides that it is an unfair labor practice for an employer to interfere with, restrain or coerce employees in the exercise of their rights under § 7 of the Act.

Under § 8(a) (5) of the Act it is an unfair labor practice for an employer "to refuse to bargain collectively with the representatives of his employees, subject to the provisions of section 9 (a)."

Section 9(a) of the Act reads as follows:

"Representatives designated or selected for the purposes of collective bargaining by the majority of the employees in a unit appropriate for such purposes, shall be the exclusive representatives of all the employees in such unit for the purposes of collective bargaining in respect to rates of pay, wages, hours of employment, or other conditions of employment: * * *."

stand" that the majority of the employees had repudiated the Union and no longer wished to be represented by it. Respondent then called attention to a recent decision of the Court of Appeals for the Sixth Circuit, apparently N.L.R.B. v. Vulcan Forging Co., 6 Cir., 188 F.2d 927, holding that an employer could not be compelled to bargain with a union under such circumstances. Respondent concluded his letter:

"Under the circumstances wouldn't it be wiser to defer consideration of the proposed negotiations until such time as it might appear that the employees desire to have your union represent them?"

There is no evidence of any further communication between respondent and the Union.

■ Respondent contends that its letter of May 1 did not constitute a refusal to bargain, but only a request for the "Union's opinion as to the advisability of a meeting in view of the repudiation of the Union by the employees." The letter, written by respondent's counsel, refers to a favorable court decision, indicates its effect, and suggests, albeit in question form, that it would be "wiser" to put off any negotiation until it appeared that the Union had secured a majority of the employees in the bargaining unit. While clothed in polite and conciliatory language, the purport of the letter was that, unless and until the Union could prove its majority, the employer was under no legal obligation to bargain and was not inclined to do so. We cannot say

that the Board was unjustified in construing this letter as a refusal to bargain.[2]

■ We think we must regard the purported communication of the employees repudiating the Union as authentic. At the same time that the employees' communication was sent to respondent, copies were also sent to the Union and to the Board. There is no evidence that the Union ever challenged its genuineness, although it would have been a simple task to check whether the nine purported signatories had in fact signed the document and it was clearly to the interest of the Union to make the fact known if they had not. It was proved that the names signed were names of employees in the bargaining unit. While respondent did not call the purported signers to verify their signatures, counsel supporting the complaint neither moved to strike the document for such failure nor made any attempt to impeach it. Under these circumstances we think it would be unreasonable to stamp the communication a possible forgery, and accordingly we take it as a fact that a majority of respondent's employees repudiated the Union on April 18, 1951.

The final question presented is whether respondent was obliged to bargain with the Union in light of the repudiation of the Union by a majority of respondent's employees within a week after the Union had been designated as bargaining representative in a Board-conducted election. This problem has given the courts some difficulty and the decisions are not harmonious. This court has not previously had occasion to pass upon the question.[3]

2. The conclusion of the letter, quoted above in the text of the opinion, is an almost verbatim copy of a letter written under similar circumstances and quoted by the court in the case referred to in respondent's letter. See N.L.R.B. v. Vulcan Forging Co., 6 Cir., 188 F.2d 927, at page 929. In that case the court took the position that the letter constituted a refusal to bargain, but held that since the employees had repudiated the bargaining agent the employer was not required to bargain. The case is discussed, infra.

3. This court has decided related questions. In N.L.R.B. v. Hollywood-Max-

well Co., 9 Cir., 126 F.2d 815, we held that where nearly two years elapsed after the choice of a bargaining representative and the employees repudiated the union upon discovering that the union's organizer had been bribed by the employer, the employer could not be ordered to bargain with the union. In N.L.R.B. v. Biles Coleman L. Co., 9 Cir., 96 F.2d 197, we held that where the employees repudiated their bargaining representative after the Board had issued its order and prior to its enforcement by this court, the employer could nonetheless be compelled to bargain with the union. The latter holding is in accord

The Wagner Act, as the National Labor Relations Act was known prior to its amendment in 1947, contained provisions for Board-conducted elections but did not specify the intervals at which such elections should be held or the effect of a certification once issued.

The Board saw fit to adopt a rule that when a bargaining representative had been elected by a majority of the employees in an appropriate unit and certified by the Board, its representative status could not be disturbed for a reasonable period, normally about a year. Whittier Mills Company, 15 N.L.R.B. 457, enforced 5 Cir., 111 F.2d 474; Century Oxford Mfg. Corp., 47 N.L.R.B. 835, enforced 2 Cir., 140 F.2d 541; Lift Trucks, Inc., 75 N.L.R.B. 998; Majure Transport Company, 95 N.L.R.B. 311, enforced 5 Cir., 198 F.2d 735; see Celanese Corp. of America, 95 N.L.R.B. 664, 672, and the extended discussions of the Board's rule in National Labor Relations Board v. Globe Automatic Sprinkler Co., 3 Cir., 199 F.2d 64, 68, 69, and General Box Company, 82 N.L.R.B. 678. However, the rule was qualified by the proviso that the union's majority could be challenged within the certification year where "unusual circumstances" were present.[4]

While the Board's rule did violence to orthodox principles of agency and on first impression appeared inconsistent with the Wagner Act's guarantee of the right of employees to bargain through representatives of their own choosing, the rule was approved by most of the courts which passed upon it prior to the amendment of the Act in 1947. N.L.R.B. v. Century Oxford Mfg. Co., 2 Cir., 140 F.2d 541, certiorari denied 323 U.S. 714, 65 S.Ct. 40, 89 L.Ed. 574; N.L.R.B. v. Botany Worsted Mills, 3 Cir., 133 F.2d 876, certiorari denied 319 U.S. 751, 63 S.Ct. 1164, 87 L.Ed. 1705; N.L.R.B. v. Appalachian E. Power Co., 4 Cir., 140 F.2d 217; see N.L.R.B. v. Prudential Life Insurance Co., 6 Cir., 154 F.2d 385, 389; Wilson & Co., Inc., v. N.L.R.B., 8 Cir., 162 F. 2d 310; but cf. N.L.R.B. v. Inter-City Advertising Co., 4 Cir., 154 F.2d 244.

The courts found ample justification for the rule. The Board's election procedure, with its advantage of impartial supervision and its guarantee of anonymity to employees in expressing their choice by secret ballot, had been designed by Congress as the most effective and reliable means of ascertaining the employees' deliberate will. Thus, when the results of such election had been certified by the Board, it was felt that repudiation of the certified representative should be established only by an equally probative technique. N.L.R.B. v. Botany Worsted Mills, 3 Cir., 133 F.2d 876, 881, 882, certiorari denied 319 U.S. 751, 63 S.Ct. 1164, 87 L.Ed. 1705; N.L.R.B. v. Century Oxford Mfg. Co., 2 Cir., 140 F.2d 541, 542, 543, certiorari denied 323 U.S. 714, 65 S.Ct. 40, 89 L.Ed. 574; N.L.R.B. v. Appalachian E. Power Co., 4 Cir., 140 F.2d 217, 222; and see the Board's opinion in the Century Oxford Mfg. Corp. case, supra, 47 N.L.R.B. 835, 845.

with the unanimous view. See, e.g., N.L. R.B. v. Swift & Co., 3 Cir., 162 F.2d 575, certiorari denied 332 U.S. 791, 68 S.Ct. 101, 92 L.Ed. 373; N.L.R.B. v. S. H. Kress & Co., 6 Cir., 194 F.2d 444. It is also settled that where the representative's loss of majority is attributable to unfair labor practices on the part of the employer, the employer may still be compelled to bargain with the union. Franks Bros. Co. v. N.L.R.B., 321 U.S. 702, 64 S.Ct. 817, 88 L.Ed. 1020; N.L. R.B. v. Andrew Jergens Co., 9 Cir., 175 F.2d 130, certiorari denied 338 U.S. 827, 70 S.Ct. 76, 94 L.Ed. 503; N.L.R.B. v. Swift & Co., supra; Superior Engraving Co. v. N.L.R.B., 7 Cir., 183 F.2d

783, certiorari denied 340 U.S. 930, 71 S.Ct. 490, 95 L.Ed. 671.

4. The Board found "unusual circumstances" where the union representing the employees was dissolved, Public Service Electric & Gas Co., 59 N.L.R.B. 325; where the bargaining representative switched its affiliation from one international union to another, so that the identity of the bargaining agent was doubtful, Carson Pirie Scott & Co., 69 N.L.R.B. 935; Jasper Wood Products Co., Inc., 72 N.L.R.B. 1306; where the number of employees in the bargaining unit doubled or quadrupled in the space of a year, Westinghouse Electric & Manufacturing Co., 38 N.L.R.B. 404; Celanese Corporation of America, 73 N.L.R.B. 864.

It was impracticable, however, for the Board to conduct elections to keep pace with every change in the sentiments of the employees in a bargaining unit. See National Labor Relations Board v. Century Oxford Mfg Co., supra, 140 F.2d at page 542; N.L.R.B. v. Inter-City Advertising Co., 4 Cir., 154 F.2d 244, 247. The processing of an election, if it were contested, consumed several months. The Board, therefore, adopted the practice of entertaining petitions for an election in a bargaining unit only after a year had elapsed since the Board's last previous certification of a representative for that unit. The interval between elections coincided with the period which the Board usually held to be a "reasonable time" for suspension of the power of employees to oust their certified representative. This did not mean, however, that a representative's authority could be revoked only in a Board-conducted election. When a reasonable time had elapsed after certification, usually a year, the presumption of the certified union's authority could be rebutted by a showing that the majority of the employees had repudiated the union, whether this choice was made manifest in an election or otherwise.

The Board's rule above referred to was also justified upon the ground that it was necessary to secure stability in bargaining relationships. As the court said in N.L.R.B. v. Century Oxford Company, supra, 140 F.2d at page 542:

> "Inherent in any successful administration of such a system is some measure of permanence in the results: freedom to choose a representative does not imply freedom to turn him out of office with the next breath. As in the case of choosing a political representative, the justification for the franchise is some degree of sobriety and responsibility in its exercise."

And in N.L.R.B. v. Botany Worsted Mills, supra, 133 F.2d at page 881, it was said, in answer to the argument that employees were free to oust their certified bargaining representative at any time:

> "The argument, while containing some elements of plausibility, would, if accepted, make chaos out of the administration of the statute and prevent the protection of the very rights which it aimed to secure. Litigants in all law suits are entitled to their rights under the law, but they must work them out in orderly fashion according to rule."

In N.L.R.B. v. Appalachian E. Power Co., supra, the court said, 140 F.2d at page 221:

> "To assume that the Board's certification speaks with certainty only for the day of its issuance and that a Company may, with impunity, at any time thereafter refuse to bargain collectively on the ground that a change of sentiment has divested the duly certified representative of its majority status would lead to litigious bedlam and judicial chaos."[5]

The Labor Management Relations Act of 1947 (commonly known as the Taft-Hartley Act), like the Wagner Act, is silent as to the effect of a Board certification of a bargaining agent. However, in passing the Taft-Hartley Act, Congress was fully advised of the binding effect given by the Board and the courts to a Board certification of a representative under the Wagner Act. With reference to § 9(c)(3) of the Senate Bill, now § 9(c)(3) of the Act, which provides, inter alia, that elections in any given bargaining unit may be held only once a year,[6] the Senate Report (submitted by Senator Taft) stated:

> "This amendment prevents the Board from holding elections more

---

5. Cf. the Board's rule that where there is a bargaining contract between a bargaining agent and the employer, the agent's representative status cannot be challenged until near the end of the contract term, approved in N.L.R.B. v. Geraldine Novelty Co., Inc., 2 Cir., 173 F.2d 14, 16, 17.

6. § 9(c)(3) of the Act provides in part as follows:
"(3) No election shall be directed in any bargaining unit or any subdivision within which in the preceding twelve-month period, a valid election shall have been held. * * *"

often than once a year in any given bargaining unit unless the results of the first election are inconclusive by reason of none of the competing unions having received a majority. At present, if the union loses, it may on presentation of additional membership cards secure another election within a short time, *but if it wins its majority cannot be challenged for a year.*" (Emphasis ours.) S.Rep.No. 105, 80th Cong., 1st Sess., p. 25.

Senator Taft, in explaining § 9(c)(3) on the Senate floor, said:

"The bill also provides that elections shall be held only once a year, so that there shall not be a constant stirring up of excitement by continual elections. The men choose a bargaining agent for one year. *He remains the bargaining agent until the end of that year.*" (Emphasis ours.) 93 Cong.Rec. 3954. [Legislative History of the Labor Management Relations Act, 1947, Vol. 2, p. 1013.]

And in the Senate Report (S.Rep.No. 105, 80th Cong., 1st Sess., p. 12) it was stated:

"*In order to impress upon employees the solemnity of their choice,* when the Government goes to the expense of conducting a secret ballot, the bill also provides that elections in any given unit may not be held more frequently than once a year." (Emphasis ours.)

If a certification was thought to be as meaningless and ephemeral as respondent would have us believe, it is hard to see how employees would approach a Board election with any solemnity, whether the interval between elections be one year or ten.[7]

It is plain that Congress, in the course of adopting the 1947 amendments to the Act, was well aware of the rule, adopted and regularly applied by the Board and approved by the courts, making the certification of a bargaining agent binding on the employees represented for a reasonable time. Under these circumstances it is a fair assumption that by its silence on the question Congress accepted this administrative and judicial construction of the Act. N.L.R.B. v. Gullett Gin Co., 340 U.S. 361, 365, 366, 71 S.Ct. 47, 95 L.Ed. 593.[8]

Of the cases arising since the passage of the Taft-Hartley Act, all but one appear

---

7. Giving further indication that in 1947 Congress was aware of the effect given a Board certification is the history of § 9(f) (7) of the House Bill, H.R. 3020. This provision would have limited certification elections to one a year, but would have permitted decertification elections at any time. Congressman Klein, in opposing the provision, said:

"Section 9(f) (7) * * * throws sharply into focus the remarkable bias of this bill against collective bargaining. That section prohibits an election in any unit or subdivision thereof in which a valid election has been held within the preceding 12 months. A sole exception is made in the case of an application to decertify a union, which I have just discussed. Consid r the result—*the greatest confusion and uncertainty if the employees have selected a bargaining representative, but absolute finality for 12 months if they have not.*" (Emphasis ours.) 93 Cong.Rec. 3557.

It is significant that the provision allowing a decertification election at any time was deleted from the House bill in conference. H.Conf.Rep.No. 510, 80th Cong., 1st Sess., 49.

8. While it is quite clear that Congress by its silence adopted the rule that a certification of a bargaining agent is binding on the employees for a reasonable time, we need not, for the purposes of this case, and we do not go so far as to say that Congress adopted a rigid rule fixing one year as the term of the certified bargaining agent's representative status. While this was the period often prescribed by the Board prior to the Taft-Hartley Act, and it appears that Congress was aware that this was the period so prescribed, the Board, prior to 1947, was by no means consistent or unqualified in stating that a certified union's representative status continued for the period of one year. See N.L.R.B. v. Globe Automatic Sprinkler Co., 3 Cir., 199 F.2d 64, where the court pointed out that the Board generally defined the certification period as a "reasonable time," "customarily" or "usually about one year." In the Globe Automatic Sprinkler case the court refused to enforce an order requiring an employer to bargain with a union which had been repudiated by a majority of the employees in the bargaining unit eleven months and one week after certifi-

to approve the rule that the representative status of a certified bargaining agent is beyond challenge for at least a "reasonable time." See N.L.R.B. v. Worcester Woolen Mills Corp., 1 Cir., 170 F.2d 13, 17, certiorari denied 336 U.S. 903, 69 S.Ct. 489, 93 L.Ed. 1069; N.L.R.B. v. Globe Automatic Sprinkler Co., 3 Cir., 199 F.2d 64, 69; N.L.R.B. v. Sanson Hosiery Mills, 5 Cir., 195 F.2d 350, 352, 353, certiorari denied 344 U.S. 863, 73 S.Ct. 103; Superior Engraving Co. v. N.L.R.B., 7 Cir., 183 F.2d 783, 792, certiorari denied 340 U.S. 930, 71 S.Ct. 490, 95 L.Ed. 671; contra: N.L.R.B. v. Vulcan Forging Co., 6 Cir., 188 F.2d 927.

In the Vulcan Forging case, supra, which appears to stand alone, the court set aside an order of the Board directing an employer to bargain with the certified bargaining representative where the employees had repudiated the representative just eight days after a Board-conducted election. The court said, 188 F.2d at page 931:

"They [the employees] are entitled by law to bargain collectively through a representative of their own choosing. To force them to bargain through a

cation of the union, on the ground that a "reasonable time" had elapsed after certification.

Cf. National Labor Relations Board v. Sanson Hosiery Mills, Inc., 5 Cir., 195 F. 2d 350, certiorari denied 344 U.S. 863, 73 S.Ct. 103, where the court apparently took the position that the only means of recalling a certified bargaining representative was by another Board-conducted election, regardless of the length of time which had elapsed since certification. The Board itself has not gone so far. The Board now follows the rule that the fact of the union's majority during the certification year can be rebutted only by a showing of unusual circumstances. However, after the first year of the certificate has elapsed, though the certificate still creates a presumption of the certified union's majority, the presumption is rebuttable in the absence of unusual circumstances. Celanese Corporation of America, 95 N.L.R.B. 664.

9. Aside from the Vulcan case, the only case which could be of comfort to respondent is N.L.R.B. v. Inter-City Advertising Co., 4 Cir., 154 F.2d 244. The bargaining unit in that case consisted of only four

representative which they had repudiated would be depriving them of their right to bargain through the representative of their choice."[9]

The language quoted overstates the effect of the rule that the authority of a certified bargaining agent is irrevocable for a "reasonable time." While under that rule the exercise of the right of employees to oust their representative is suspended for a time, employees are certainly not "deprived" of that right. And even this temporary suspension of the right is not recognized where unusual circumstances would render it plainly unreasonable or unjust. The question is whether this limited restriction on the rights of employees is consistent with the policies and provisions of the National Labor Relations Act considered as a whole. In light of what we consider the manifest intent of Congress, and in accordance with the great weight of judicial authority, we think that it is.

We are of the opinion that the right of employees to bargain through representatives of their own choosing must be, and was intended to be, restricted to the

employees when a Board-conducted election resulted in a union's being certified as bargaining representative for the unit. Thereafter the employer, without being actuated by hostility toward the union, and in due course of business, made changes in working hours in the plant. As a consequence, one of the employees in the bargaining unit was discharged. Another was replaced and transferred to another department. At the time of the refusal of the employer to bargain only one of the three employees in the bargaining unit was a union member. The court, one member dissenting, set aside an order of the Board directing the employer to bargain with the union. The court distinguished its earlier case of N. L.R.B. v. Appalachian E. Power Co., 4 Cir., 140 F.2d 217, on the ground that it would have been a simple task for the Board to conduct another election because of the small size of the bargaining unit. The Inter-City case could well be said to have involved "unusual circumstances." It is of dubious precedent value in light of the dictum in the recent case of N.L.R.B. v. Borchert, 4 Cir., 188 F.2d 474.

extent necessary to make workable and effective the administrative scheme devised for the protection of that right and for the promotion of the other objectives of the Act. A primary objective of the Wagner Act, and to an even greater extent the Taft-Hartley Act, was stability in industrial relationships. To achieve the desired industrial repose "a bargaining relationship once rightfully established must be permitted to exist and function for a reasonable period in which it can be given a fair chance to succeed." Franks Bros. Co. v. N.L.R.B., 321 U.S. 702, 705, 64 S.Ct. 817, 819, 88 L.Ed. 1020; see N.L.R.B. v. Prudential Insurance Co., 6 Cir., 154 F.2d 385, 389.

If the argument of respondent is accepted, a Board-conducted election and certification, instead of inaugurating a period of industrial repose, would lead only to continued raiding of the bargaining agent's membership and the disrupting influence of rival union activities within the bargaining unit itself. Employers would be beset by conflicting demands and claims for recognition without a means of determining with certainty whether, or with whom, they should bargain. Bargaining relationships once established would be subject to destruction upon every volatile whim or caprice and before results could be achieved and judged by the intended beneficiaries. It was this situation which the provisions for Board-conducted elections were designed to obviate. We see no reason why this purpose should be frustrated by treating the right of employees to choose their representatives as an absolute, above reasonable restrictions designed to promote "some degree of sobriety and responsibility" in the exercise of that right.

Returning to the facts of the case at bar, it is plain that when the employees repudiated the Union one week after the election a "reasonable time" had not passed to give the bargaining relationship a fair chance to succeed. No unusual circumstances appear. Accordingly, the Board was justified in concluding that the Union continued to be the bargaining representative for the employees and that respondent's refusal to bargain constituted an unfair labor practice.

The order of the Board is affirmed and will be enforced.