**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**YUTANA BARGE LINES, INC., Respondent.**

No. 16966.

United States Court of Appeals
Ninth Circuit.

March 25, 1963.

**526**

Stuart Rothman, Gen. Counsel; Dominick L. Manoli, Assoc. Gen. Counsel, Marcel Mallet-Prevost, Asst. Gen. Counsel, Melvin Pollack and Elliott Moore, Attys., N. L. R. B., Washington, D. C., for petitioner.

D. A. Burr, G. F. Boney, and Theodore M. Pease, Jr., Anchorage, Alaska, for respondent.

Before JERTBERG, MERRILL and KOELSCH, Circuit Judges.

KOELSCH, Circuit Judge.

This case is here on the petition of the National Labor Relations Board, pursuant to Section 10(e) of the National Labor Relations Act [61 Stat. 136, 29 U.S.C. § 151 et seq. as amended], for enforcement of its order issued against the respondent, Yutana Barge Lines, Inc. (Yutana).

The Board concluded: (1) that on and after June 18, 1957, Yutana violated Sections 8(a) (5) and 8(a) (1) of the Act by refusing to bargain in good faith with the International Brotherhood of Longshoremen, Local 38–171, AFL–CIO, (Union); (2) that on April 20, 1957 Yutana violated Sections 8(a) (3) and 8(a) (1) by refusing to hire a number of former employees because of their membership in the Union. By its order the Board directed Yutana to cease its unfair practices, to make certain employees whole and to post appropriate notices.

Yutana commenced business in 1955; its terminal is in Nenana, Alaska; it transports freight by barge from and to points on the Yukon and Kokuyok Rivers. The business is seasonal, being normally limited to the period between the middle of May and the first of October, because ice conditions on the rivers prevent travel during the remainder of the year. Yutana employs most of its help on a seasonal basis, but it does hire a few men in the off-season to act as watchmen and to overhaul equipment for use in the coming season.

The Union maintains its headquarters in Anchorage, Alaska. In 1956 one of its representatives visited Nenana, where he discussed with Yutana a contract covering the latter's employees. Shortly afterward the Union petitioned the Board for certification as collective bargaining representative of Yutana's production and maintenance employees.

In October, 1956, the Board ruled that "all employees at * * * [Yutana's] Nenana, Alaska, operations engaged in longshore work, loading and unloading barges and railroad cars, and stockpiling freight, and in the maintenance of equipment, including marine ways employees, carpenters, mechanics, and helpers, and oil plant laborers; but excluding office clerical employees, tugboat employees, and supervisors * * *" constituted an appropriate bargaining unit. Following an election, which the Union won, the Board on June 18, 1957 certified the Union as the collective bargaining agent for all Yutana's employees within the designated unit.

During the bargaining negotiations that followed, Yutana steadfastly refused to discuss oil plant laborers and marine ways workers, or to consider any contract of longer duration than its operating season. Later in 1957 a contract was signed, but it omitted the two classes of employees and was for the more limited term. The Union's representative advised Yutana at the time that because of these limitations the contract was subject to approval of the Local at Anchorage. But the Local thereafter rejected it. At further meetings, Yutana adhered to its position and, although a sec-

ond contract was signed early in 1958 by the Union's representative, the Local again would not accept it. The parties again negotiated at Anchorage in April, 1958. But no agreement was reached. Afterwards Yutana posted and put into effect a scale of wages lower than the one followed the year before.

## I. THE REFUSAL TO BARGAIN.

The Board found that Yutana violated Section 8(a) (5) of the Act in three particulars, (a) by refusing to bargain with respect to marine ways workers and oil plant laborers from and after June 18, 1957, the date the Union was certified; (b) by insisting on a contract limited to its operating season; and (c) by unilaterally decreasing wages.

(a) In this proceeding Yutana does not attack the Board's bargaining unit determination, nor dispute the fact that it refused the Union's repeated request to negotiate regarding marine ways workers and oil plant laborers until April 23, 1958. In essence, Yutana's defense was and is that it did not intend to have (and in fact did not have) any marine ways workers in its employ during 1957 and that, because of material changes occurring in its operations after the unit determination was made, none of its employees came within the job classification of oil plant laborers.

■ The Act does not require an employer to maintain the integrity of a duly designated bargaining unit. Indeed the Board itself has taken the position that: "Since changing conditions in industry necessitate revision of bargaining units which will best effectuate the policies of the Act, the Board has never held that once it has established an appropriate unit for bargaining purposes, an employer may not in good faith, without regard to Union organization of employees, change his business structure, sell or contract out a portion of his operations, or make any like change which might affect the constituency of the appropriate unit without first consulting the bargaining representative of the employees affected by the proposed business change." Ma-honing Mining Co., 61 N.L.R.B. 792, 803 (1945).

■ It has been held that when a unit ceases to exist, the employer need not engage in bargaining with the representative of that unit. In N. L. R. B. v. Houston Chronicle Publishing Co., 211 F.2d 848 (5th Cir., 1954), the Fifth Circuit concluded that, where a newspaper for business reasons changed its method of delivery of newspapers from a system operated by employees to one operated by independent contractors, the employer was under no duty to bargain with the representative of the unit composed of former employees, the reason being that any agreement would be purely abstract. It would seem to follow, and we are of the opinion, that if because of business changes there are no longer employees in a component job category within the unit, then an employer is under no obligation to negotiate with respect to wages, hours of employment, and other working conditions for the component group. The Board apparently takes this view, for in National Dairy Products Corp., 127 N.L.R.B. 313 (1960), it dismissed a complaint brought against an employer saying that since "the Respondent did not employ any helpers for whom the Union sought bargaining * * * the Respondent did not violate Section 8(a) (5) of the Act by notifying the Union that it would be a waste of time to negotiate for persons it did not employ." Id. at 315.

■■ But although the law is with Yutana, the evidence was not such that the trial examiner and the Board were required to find according to its factual contentions. Yutana's concessions that it refused to bargain with respect to marine ways workers and oil plant laborers, coupled with the fact of the Board's certification of the Union as their official bargaining agent, made out a prima facie case of a violation of Section 8(a) (5). "Even assuming that there was a further burden on the General Counsel to show that the employee status of the helpers continued, that burden was met by the Board's finding of

employee status in the prior representation case, and the well-established legal principle that a state of affairs shown to exist is presumed to continue until the contrary is shown." National Dairy Products Corp., supra, at p. 315.

The evidence relied upon by Yutana to justify its refusal to bargain with respect to marine ways workers consisted of the following testimony of the Union's witness, Cox, elicited on cross-examination:

"Q. [By Yutana's counsel] In discussion [sic] the marine ways employees [during a bargaining session], do you recall my telling you that the marine ways area was not being used by the company and had not been used by the company, they were not contemplating using the marine ways area?

"A. Yes * * *."

█ The witness's affirmation of counsel's earlier statement would not establish the truth of the matters counsel had stated. For that purpose the witness's testimony was hearsay. [6 Wigmore, Evidence, §§ 1766, 1790 (3d ed. 1940]. "Mere uncorroborated hearsay or rumor does not constitute substantial evidence," and could not afford the basis for a finding. Consolidated Edison Co. v. N. L. R. B., 305 U.S. 197, 230, 59 S.Ct. 206, 83 L.Ed. 126 (1938)

█ Yutana had one oil plant laborer in its employ in 1956 when the bargaining unit was constituted; at that time Yutana was transporting oil products of the Union Oil Company under contract with that company. It appears that the Union storage plant adjoined Yutana's property and that Yutana's oil plant laborer filled the containers on Yutana's dock by means of a hose or pipeline extending from Union's premises. After 1956, however, Yutana's contract was with the Standard Oil Company and, because Standard's plant was at some distance from the dock, Yutana's employees performed their duties elsewhere. Yutana's manager made the direct assertion that after 1956 the men who readied oil for shipment performed a different kind of work than that done by oil plant laborers; but the most the evidence shows is that some additional handling, the nature of which is not apparent, was required.

(b) Yutana admits that it would not negotiate a contract having a duration beyond its operating season, but argues that this fact could not be the basis for finding that it refused to bargain in good faith. The Board concluded that, "as such insistence was in derogation of our certification, we find, in agreement with the Trial Examiner, that this conduct was evidence of bad faith bargaining and violative of Section 8(a) (5) of the Act." This language makes it apparent that the conclusion was not predicated upon a finding that Yutana refused to bargain at all with respect to off-season employees, else the Board would not have considered the question of good faith. N. L. R. B. v. Katz, 369 U.S. 736, 742-743, 82 S.Ct. 1107, 8 L.Ed.2d 230 (1962).

But was the Board's finding of Yutana's lack of good faith based upon substantial evidence?

██ It is mandatory upon an employer to bargain with respect to the duration of a contract, [United States Pipe & Foundry Co. v. N. L. R. B., 298 F.2d 873 (5th Cir., 1962), approving 129 N.L.R.B. 357 (1960)], however the Act does not require agreement and "the Board may not, either directly or indirectly, compel concessions or otherwise sit in judgment upon the substantive terms of collective bargaining agreements." N. L. R. B. v. American Nat'l Ins. Co., 343 U.S. 395, 404, 72 S.Ct. 824, 829, 96 L.Ed. 1027 (1952). No inference of bad faith can be rested upon an employer's insistence upon particular substantive provisions unless those provisions concern trivial matters or are obviously intolerable. N. L. R. B. v. Reed & Prince Mfg. Co., 205 F.2d 131 (1st Cir., 1953), cert. denied, 346 U.S. 887, 74 S.Ct. 139, 98 L.Ed. 391 (1953); N. L. R. B. v. Montgomery Ward & Co., 133 F.

2d 676, 686–687, 146 A.L.R. 1045 (9th Cir. 1943); N. L. R. B. v. Tower Hosiery Mills, Inc., 180 F.2d 701 (4th Cir., 1950), cert. denied, 340 U.S. 811, 71 S.Ct. 38, 95 L.Ed. 596 (1950); Cox, The Duty to Bargain in Good Faith, 71 Harv.L.Rev. 1401, 1419–22 (1958).

The duration of a contract is a substantial matter, and Yutana's demand for a contract limited to its operating season was not unduly harsh on its face. The trial examiner did not view Yutana's demand in isolation. In light of other conduct and circumstances he found it to be evidence which, along with other evidence, justified an inference of bad faith.

But the Board rejected the trial examiner's method of analysis,[1] and looked only to the fact that Yutana's demand was for a contract expiring prior to the end of the certification year.[2] Here the Board erred; it is not *per se* indicative of bad faith to refuse to accept a contract having a duration coextensive with the certification year,[3] and standing alone a proposal for a contract of a lesser duration is not substantial evidence of bad faith. See N. L. R. B. v. Henry Heide, Inc., 219 F.2d 46 (2d Cir., 1955).

(c) The Board's conclusion that Yutana committed a separate refusal to engage in collective bargaining when it posted and put into effect the reduced scale of wages on April 30, 1958, was based upon a finding that, although Yutana at the bargaining session had proposed the lower wage scale, "it never consulted with the Union in regard thereto, nor advised the Union that it intended to implement the proposal." It is well settled that an employer violates Section 8(a) (5) of the Act if he makes a change in working conditions of his employees during the course of bargaining negotiations without consulting his employees' representative, the reason being that "such unilateral action is considered to amount to bargaining with the employees individually rather than through their certified representative * * *." Lloyd A. Fry Roofing Co. v. N. L. R. B., 216 F.2d 273, 276 (9th Cir., 1954). Yutana does not question this

1. In its decision the Board stated:

"1. While we agree with the Trial Examiner's conclusion and find that on and after June 18, 1957 Respondent violated Section 8(a) (5) by failing to discharge its statutory obligation to bargain in good faith with the Union, we do so only for the following reasons:

\*   \*   \*   \*   \*

"Further, during the course of the negotiations, the Respondent sought the execution of a seasonal contract, limited to its May to September season. The Union indicated its unwillingness to enter into such a seasonal contract but instead made known its desire for a yearly contract to comport with the certification which included year round employees who were entitled to year round representation. Without indicating to the Union its willingness, to make a contract consistent with the certification and at least coextensive with the certification year, the Respondent insisted upon a seasonal contract. As such insistence was in derogation of our certification, we find, in agreement with the Trial Examiner, that this conduct was evidence of bad faith bargaining and violative of Section 8(a) (5) of the Act."

2. The certification-year rule is that, when a bargaining representative has been elected and certified, its representative status cannot be disturbed for a period of one year. Brooks v. N. L. R. B., 348 U.S. 96, 75 S.Ct. 176, 99 L.Ed. 125 (1954), affirming 204 F.2d 899 (9th Cir., 1953).

3. In American Steel Foundries, 112 N.L. R.B. 531 (1955) the following dictum appears: "But if the Respondent nevertheless had valid reason to and did in good faith doubt that the Union's majority would continue beyond the period of certification, and was unwilling to make a contract to extend beyond the certification year, then in fulfillment of its statutory obligation to bargain, and in the very nature of the bargaining process, it was affirmatively required, at the minimum, to indicate to the Union its willingness to make a contract for a term coextensive with the remainder of the certification year." (p. 534). We think this statement is correct only to the extent that it is based on the Board's view of the circumstances of that case—it is not a rule of law.

proposition but it attacks the Board's finding as totally unsupported by the evidence.

Yutana's position, like that of the respondent in N. L. R. B. v. Andrew Jergens Co., 175 F.2d 130 (9th Cir., 1949), cert. denied 338 U.S. 827, 70 S.Ct. 76, 94 L.Ed. 503 (1949), is that the wage change was justified at that time because bargaining was at an impasse. In Jergens, this court recognized that in such a situation, if an employer has made "a bona fide but unsuccessful attempt to reach an agreement with the Union, or where the Union bears the guilt for having broken off relations * * * [then he has] fulfilled his statutory obligation and is free to exercise his power of management." (175 F.2d p. 136).

■■■ But a canvass of the entire record persuades us that the Board's finding was clearly right. The measure of an employer's duty in bargaining is to "participate actively in the deliberations so as to indicate a present intention to find a basis for agreement * * *"; to make "sincere effort * * * to reach a common ground." N. L. R. B. v. Montgomery Ward & Co., 133 F.2d 676, 686 (9th Cir., 1943). See also, Cox, The Duty to Bargain in Good Faith, 71 Harv. L.Rev. 1401 (1958).

■■■ While "the Act does not encourage a party to engage in fruitless marathon discussions at the expense of frank statement and support of his position," [N. L. R. B. v. American National Insurance Co., 343 U.S. 395, 404, 72 S. S.Ct. 824, 829 (1952)] it clearly requires each to afford the other a fair opportunity to exchange and discuss proposals and counter-proposals.

Prior to the wage change, the bargaining parties had met at Anchorage where they held a series of meetings, commencing on April 21. They were in sharp disagreement over wages, holidays, overtime, hours for meals, and a host of other matters. The Union took the position that wages should be increased, while Yutana insisted they should be lowered. In addition, until the third day, Yutana flatly refused to consider any contract which extended to marine ways workers and oil plant laborers. This, and other matters, were discussed without much progress being made. However, late in the afternoon of that session Yutana finally expressed a willingness to bargain regarding such employees, and proposed a scale of wages which applied to them, as well as the other classes of employees in the unit. Although the Union declared the entire scale was unacceptable, proceedings concluded with the understanding that the next day a meeting would be held at which Yutana would submit for the Union's consideration all its proposals in the form of a complete written contract. But Yutana's representative failed to keep the appointment; instead, he returned to Nenana and mailed a copy of the proposed contract to the Union. On April 30, Yutana, not having received a reply, put the proposed schedule of wages into effect.

These circumstances do not justify a conclusion that Yutana had fulfilled its duty to bargain in good faith to the point of impasse. They simply show that Yutana terminated the meetings and chose to submit its proposal on a "take it or leave it" basis. Yutana did not seek to explain or justify its proposals or entertain any views or counter-proposals of the Union; instead, it foreclosed all further negotiation. The fact that the Union did not communicate with Yutana prior to the wage change is not significant; the interval was short; Yutana had not indicated when the change would be made, and prior meetings had been sporadic. It does appear that about three weeks later the Union sought to initiate a further meeting.

## II. THE DISCRIMINATORY REFUSAL TO HIRE.

The Board's conclusion that Yutana engaged in discriminatory hiring practices is based upon a series of events which occurred early in 1957. On April 20, the Union, knowing that Yutana would soon be hiring men, directed eighteen of its members to apply for work.

They did so, visiting Yutana's office en masse. Quentin Qualle, whose testimony was credited by the trial examiner, gave the following account of what occurred there:

"Mr. Goodwin [Yutana's local manager] * * * asked what can I do for you boys. I stated that we had come to apply for work and that Vernon [the bookkeeper in the office] had taken our names. Mr. Goodwin stated that the proposed contract of ours would be impossible for us [Yutana] to sign. I stated, we assumed it was satisfactory to the company because of the fact that you have not contacted us or pointed out any corrections that you would like to have made in it. Fredericks asked Mr. Goodwin, are you going to employ any men from this gang. Mr. Goodwin replied, no * * * I told Mr. Goodwin that if he wanted any men, we were ready to go to work, to call Al Ketzler [the Union's dispatcher at Nenana] * * *."

Qualle further testified that during the above exchange Goodwin inquired if the applicants had joined the Anchorage Local, and when "most of the men spoke up, yes, in a body," Goodwin suggested, "why don't you go to Anchorage to work, then?"

The Board, although recognizing that Yutana had not yet commenced operations and that there were no jobs available on April 20, concluded that Yutana had refused to hire seventeen of the eighteen applicants because they were members of the Union.[4]

Yutana denied that it discriminated against the applicants, and asserted that their Union membership was not a factor which it then or thereafter considered with respect to their eligibility for employment. It sought to explain the statements of its manager and its later action on the ground that it honestly and reasonably believed the men were unwilling to work except at the wages currently demanded by the Union, and which wages Yutana would not pay.

"The Board's findings are entitled to respect," [Universal Camera Corp. v. N. L. R. B., 340 U.S. 474, 490, 71 S.Ct. 456, 465, 95 L.Ed. 456 (1951)] but nevertheless we are unable to accept the Board's decision with respect to this particular charge because we "cannot conscientiously find that the evidence supporting that decision is substantial, when viewed in the light that the record in its entirety furnishes, including the body of evidence opposed to the Board's view." (Id. at 488, 71 S.Ct. p. 464).

■ Goodwin's subjective testimony was consistent with Yutana's position and not inconsistent with anything that was said or done on April 20. But even granting that the situation afforded some support for an inference to the contrary, nevertheless there was additional evidence bearing on the issue which we think demonstrates that the Board's appraisal was wholly unwarranted. Within two days after the en masse visit, Goodwin offered several of the men jobs at Yutana's wages. Only after they had declined, on the Union's advice, did Yutana hire four non-union men. The Union immediately commenced picketing. When Yutana again needed men, it renewed its offer to Union men; they accepted, and the pickets were withdrawn. Thereafter, Yutana hired several more Union men.

■ We conclude that the Board's order must be modified by eliminating the provisions requiring Yutana to make whole the seventeen men who applied for work on April 20, 1957 for any loss of wages suffered as a result of discrimination against them * * *," and to post notices which contain a statement to that effect. As thus modified the order will be enforced.[5]

4. The Board held that Yutana was not obliged to rehire one of the eighteen men because he had been discharged for cause before the close of the preceding season.

5. Included in the part of the Board's order which we approve is the requirement.

that Yutana bargain with respect to oil plant laborers and marine ways workers. We are aware that, prior to the filing of the instant charges, Yutana had recognized its obligation toward these classes of employees. However, a belated recognition of this duty does not expunge the violation arising from its earlier refusal, nor affect the jurisdiction of the Board to make an order prohibiting repetition of that conduct. N. L. R. B. v. Sewell Mfg. Co., 172 F.2d 459 (5th Cir., 1949); cf. Local 1976, United Brotherhood of Carpenters v. N. L. R. B., 357 U.S. 93, 97 & n. 2, 78 S.Ct. 1011, 2 L.Ed. 2d 1186 (1958).