**NATIONAL LABOR RELATIONS BOARD**
v.
**HOUSTON CHRONICLE PUB. CO.**
No. 14543.

United States Court of Appeals Fifth Circuit.

April 9, 1954.

A. Norman Somers, Asst. Gen. Counsel, David P. Findling, Associate Gen. Counsel, George J. Bott, General Counsel, Bernard Dunau and Rosanna Blake, Attys., N. L. R. B., Washington, D. C., for petitioner.

Frank A. Liddell, W. O. Huggins, Jr., Charles R. Vickery, Jr., Tom M. Davis, Houston, Tex., Liddell, Austin, Dawson & Huggins, Houston, Tex., of counsel, for respondent.

Before HUTCHESON, Chief Judge, and BORAH and RIVES, Circuit Judges.

RIVES, Circuit Judge.

The National Labor Relations Board, pursuant to the provisions of Section 10(e) of the National Labor Relations Act, as amended,[1] petitions the court for enforcement of its decision and order reported at 101 N.L.R.B. No. 198.

The unfair labor practices found by the Board center about a change made by the respondent on October 20, 1950 in its method of distributing its newspaper, The Houston Chronicle, in the City of Houston, Texas. Respondent had theretofore distributed its papers through a City Circulation Department.[2] The city was divided for distribution purposes into six zones, to each of which was assigned an employee designated as a "supervisor". Below the supervisors were 48 employees known as "district managers" who delivered the papers to carrier boys for distribution to subscribers, were responsible for collections, and assisted the carriers in soliciting new accounts.[3] Other employees included an assistant manager, a chief clerk, a dock foreman, five rack men, three dock boys, two dealer boys, two street salesmen, fourteen office clerks, a stenographer and eleven crew managers.

On October 20, 1950, respondent abolished its City Circulation Department and instituted an independent contractor system of distribution. It discharged most of the employees in its circulation department and started distributing its papers through 49 independent contractors of whom 43 were former district managers and 6 former supervisors.

The Board found that the respondent's change in its method of distribution and its discharge of 59 circulation department employees in connection with such change were motivated by a desire to avoid its statutory obligation to bargain with the American Newspaper Guild, C. I. O. Local 113, herein called the union; that the respondent thereby violated Sec. 8(a)(1) of the Act in that it abridged the employees' right to bargain

---

1. 61 Statutes 136, 29 U.S.C.A. § 151 et seq.

2. Respondent also had a Country Circulation Department, which is not involved in this proceeding.

3. In 29 N.L.R.B. 1043 the Board found that the carrier boys of this newspaper were independent contractors and they are not involved in this proceeding.

collectively; that the respondent also violated Sec. 8(a)(3) of the Act in that the discharges it effected constituted discrimination in employment to discourage union membership. The Board further found that the respondent threatened its employees that it would change its method of distribution if the employees organized a union, warned them of other reprisals for engaging in union activity, interrogated the employees concerning their union sympathies and activities, and otherwise obtained information concerning such activities. The Board found that this conduct was independently violative of Sec. 8(a)(1) of the Act and furnished additional evidence of an illegal motivation underlying respondent's change in its method of distribution. Finally, the Board found that respondent refused to bargain collectively with the union upon request, in violation of Sec. 8(a)(5) of the Act.

The respondent answers that the order of the Board is not supported by substantial evidence on the record considered as a whole, and that the enforcement of the order would not serve to effectuate the policies of the National Labor Relations Act, as amended, but would have the opposite effect.

By way of intervention, 42 of the 49 independent contractors now handling the circulation of the newspapers, 32 of whom were employed by the respondent as district managers prior to October 20, 1950, petition the court not to require the re-establishment of the district manager system of distributing newspapers.

The questions presented for decision are: (1) whether substantial evidence on the record considered as a whole supports the Board's finding that the respondent effected its change to the independent contractor system of distribution, and discharged 59 employees in connection with that change, in order to defeat the employees' exercise of their organizational rights and to avoid its obligation to bargain with the union; (2) whether the Board properly found that respondent violated Sec. 8(a)(1) of the Act by threatening its employees because of their union activities and by interrogating them concerning these activities; (3) whether the Board properly found that respondent violated Sec. 8(a)(5) of the Act by refusing to bargain with the union on request; and (4) whether the Board's order is valid and proper.

(1) The primary and principal question presented is whether substantial evidence on the record considered as a whole supports the Board's finding that respondent's change in its distribution method and its discharge of the 59 employees were illegally motivated. Respondent's officers responsible for that change were its Executive Vice-President J. H. Butler and its City Circulation Manager Edgar B. Anderson; they were the only witnesses who actually knew the motive or motives for the change. Each of them testified directly and positively that the change was made for economic reasons.[4] The petitioner vigorously at-

4. Among the claimed economic reasons were the following:

(1) That the independent contractor system resulted in better delivery, and was an easier method for the newspaper to collect its money;

(2) That it provided more incentive for new business;

(3) That it resulted in closer observation of the carrier boys;

(4) That it saved expenses paid out prior thereto for cord, twine, paper and other materials, and labor for the wrapping of bundles;

(5) That it was more efficient because the contractors would operate their busi-

ness more efficiently, with more care and thought in selecting carrier boys and give carrier boys better training and see that they perform better, because the contractors were vitally interested in their earnings; and complaints would be checked better;

(6) That it would eliminate trucking expense, payroll, save insurance and taxes;

(7) That it would permit a reduction of personnel in the accounting department to make out bills, for where they were then (under the old District Manager system) making out 1200 carrier and 300 or 400 news dealer bills per month, under

tacks the adequacy of the business reasons advanced by respondent.[5] The respondent, in turn, seeks to answer the petitioner's attack, but we think that we have followed this phase of the controversy far enough. The petitioner concedes that respondent may suspend its operations or change its business methods so long as respondent's change in operations is not motivated by the illegal intention to avoid its obligations under the Act. See Martel Mills Corp. v. N. L. R. B., 4 Cir., 114 F.2d 624; N. L. R. B. v. Union Pacific Stages, 9 Cir., 99 F.2d 153; N. L. R. B. v. Grace Co., 8 Cir., 184 F.2d 126; 152 A.L.R. 149, et seq. The issue is not whether the business reasons advanced by the respondent were good or bad, but whether the respondent actually in good faith had business motives for the change, or whether the change was illegally motivated. The Board reached the conclusion that respondent's real motive was to defeat concerted activity and the organization of a union local by its employees; and this it inferred not only from what it considered the weakness of respondent's explanation of its economic reasons, but from such things as (a) the sequence of events, (b) warnings and interrogations of the employees, (c) the precipitate manner of accelerating the change, and (d) background evidence claimed to show an anti-union animus of respondent.

(a) Petitioner in its brief sets forth the sequence of events as follows:

"On October 9, 1950, department head Anderson agreed to meet with the men on October 11 to discuss their request for a wage increase; on October 10, informed of the men's request, respondent's vice-president wrote a memorandum to his department head 'to consider the individual contractor system * * * because it might be, that the new system this would be cut to less than 100;

(8) That it would permit great savings to the company by the elimination of salaries of approximately 63 men and the district supervisors, plus the crewmen, and social security in connection therewith; that upkeep, maintenance and depreciation on 25 to 27 trucks would be eliminated;

(9) That the Houston Post, The Fort Worth Star Telegram and the Port Arthur News which employed this system recommended it highly and felt that the system was superior to the district manager system; and,

(10) That other metropolitan newspapers in the country employed this system, including some in St. Louis, Missouri; Detroit, Michigan; Chicago, Illinois and Cleveland, Ohio.

5. To quote from petitioner's brief:

"In short, the inadequacy of respondent's explanation comes to this: respondent failed to show either that it was sustaining increased operating costs under the district manager system or that it had any adequate estimate of anticipated comparative costs under the independent contractor system which could businesswise lead it to the conclusion that its adoption would overcome increasing costs. The salaries that respondent would no longer have to pay district managers have no significance in the absence of a showing that its financial arrangements with the district managers would cost respondent less. Yet no such showing was made; indeed, the financial arrangements with the independent contractors had not even been calculated when the change was made; and respondent's ultimate arrangement with the independent contractors was designed to yield them an income greater than that enjoyed as a district manager. Nor had respondent made a showing that it was sustaining increasing labor costs under the old system. Similarly, the elimination of expense in operating a fleet of trucks has no significance in the absence of a showing that the cost of substituted transportation services was to be less. Yet respondent made no such showing; indeed, at the time of the change respondent's arrangement with the independent trucking firm was that of a 'gentlemen's agreement' with only an 'estimated price' fixed which was not to be made firm until a 'trial period' had elapsed. Finally, the only specific item of increased expense cited by respondent under the old system was the cost of extensive promotional campaigns. Yet after the change respondent continued to bear the expense of such campaigns."

the time is approaching that we will be forced into changing our system'; on October 11, the department head met with the men and read the vice-president's memorandum to them. Between October 11 and 16, the employees began union organization, held two union meetings, and the employee response was great; on October 16, respondent's vice-president decided to change to the independent contractor system 'as quickly as possible', by November 1 if feasible but no later than November 15, and the employees were so informed. On October 16, the Union requested that respondent bargain with it, the request was repeated on October 19, and a meeting was arranged on that day for the morning of October 21; on October 19, the same day as the Union requested bargaining, respondent decided to accelerate the November 1 changeover date, put the independent contractor system into effect on October 20, and the reason for the acceleration was that the Union's representative 'was going to ask [respondent] to bargain with him for a unit that included district managers' and 'we don't want to bargain with him'. On October 21, when the Union's representative met with respondent pursuant to their October 19 agreement, respondent refused to bargain with him for any unit of employees which included the district managers on the ground that they were no longer in its employ."

The respondent calls attention to the following additional "facts found by the Board, in chronological order, material on 'sequence of events':

"In August, 1950 (*two months before any claimed concerted activity or union organizational activity*) Respondent's circulation manager, Mr. Anderson, met with Mr. Nogle, circulation manager of the Port Ar-

thur News which employed the 'Independent Contractor' system, and the savings, efficiency and productivity features of that system were detailed to Anderson. At the conclusion of the meeting Anderson told Nogle that he (Anderson) was going to put the 'Independent Contractor' system into effect as soon as he could.

"Anderson made an investigation of the Independent Contractor system prior to October, 1950. The desirability of such change was discussed by Respondent's officers during the month of September, 1950, *and serious consideration given such change at that time* because of Respondent's loss of comparative lead in circulation and rise in operating costs, but it was decided to await the publisher's statement for the six months period ending September 30, 1950, so that the exact additional figures would be available and to make a definite decision at that time as to the change to the new circulation system.

"On October 9, 1950, following Anderson's return from vacation, Butler called him in, said he had seen the September 30th publisher's statement and that he was unhappy about the record of the Chronicle * * *."

The respondent emphasizes that: "On October 11, 1950, *immediately after* being advised of the contemplated investigation and study of the change to the 'Independent Contractor' system, it is admitted that *for the first time* the district managers contacted the union *and the first union meeting was scheduled for that night.*"

We agree with the respondent that the sequence of events, if considered substantial evidence of motive, tends more to indicate that the union organization began in an effort to prevent the change in system than to sustain the inference

drawn by the Board.[6] The respondent had been considering and investigating the change for some time and the union movement was quickly instituted by some of the employees who felt that, if the work was contracted out, they would lose their jobs.

On October 16, 1950, the respondent formally announced to the district managers that it would change to the independent contractor system of city circulation. The union immediately demanded the right to bargain concerning the change; and the respondent promptly replied that it had been considering the change for months and that it was being made solely for business and economic reasons. Of course, if that was true, the employees who would be affected by the plan could not, by forming a union, prevent the employer from contracting his work out.

(b) The petitioner urges that, in addition to the inference of illegal motivation from the sequence of events, the Board found "direct evidence of the respondent's unlawful purpose" from warnings and interrogations of the employees.[7]

All of these statements were made after announcement of the contemplated change on October 11, 1950. While the supervisors meet the test of supervisors for whose conduct the respondent is responsible, as defined in Section 2(11) of the Act, 29 U.S.C.A. § 152(11), the record reflects that the employees considered the supervisors as belonging to the employee group rather than in a managerial category. All of the supervisors were invited by a member of the union committee to attend the union meeting of October 18, and five out of six such supervisors did so attend. After the public announcement of the

6. This is borne out by the only direct evidence of intention of any of the employees in signing union cards. Adrian S. Morgan, a witness offered by the General Counsel, testified in effect that on the night of October 11, 1950 he joined the union to prevent the change-over and "to hold my job".

7. That evidence is detailed in the petitioner's brief as follows:

"From the period of commencement of organizational activity on October 11 through the Union's second request to bargain on October 19, respondent through its supervisors threatened the employees that persistence in seeking collective bargaining would result in a change to the independent contractor system. Thus, after asking whether the employees were going to organize, supervisor Bales warned that: 'the Chronicle would go independent,' and later repeated his warning that: the Chronicle 'would go independent if [the employees] continued to try to join the Union.' 'Mr. Butler would not let [them] join the Union,' he 'would go independent first; put the independent contractor system into effect.' Supervisor Harrell warned that: Department head 'Anderson never did want a union there' and that he (Harrell) 'didn't think the Union could do any good, that the Chronicle could go independent and it would kill the Union.' Supervisor Brockman warned that: 'You boys are not going to make it,' and 'You know what is going to happen. * * *' Department head

'Anderson is going to bring the independent contractor system into effect.' To organize 'was like knocking your head against a stone wall.'

"In addition to these warnings explicitly mentioning the change in the system of distribution, department head Anderson threatened in a more generalized tenor that: employee Brien 'would probably be hurt by [his] activities in [the Union],' and on a later occasion in speaking to employee Weeks threatened that: 'the company had a different attitude * * * toward employees after they became unionized' and that he, Anderson, 'don't want [the] department to go Union.'

"Futhermore, throughout this brief and critical organizational period, respondent interrogated its employees concerning their union activity. Department head Anderson asked an employee whether he was going to a union meeting, and asked another employee if he had any union cards in his pocket and how many he had signed up. Supervisor Brockman asked an employee if 'the boys were really going over to the Guild this time'; supervisor Harrell asked an employee 'if everyone was going to be' at a forthcoming union meeting, and supervisor Little asked if the men 'would go union'; and supervisor Bales asked an employee how many employees had not signed union cards and asked for and received a list of those who it was believed had not joined."

contemplated change, it would have been practically impossible and contrary to human nature to expect the employees and the supervisors to remain silent on the subject. Nor do we think that Anderson's statements and interrogations, all made subsequent to the announcement of the contemplated change on October 11 and many made in conversations begun by the employees addressed, reflect an illegal motive in the decision to effect the change.

(c) Petitioner urges that, in addition to the sequence of events and the evidence of threats and interrogations, the Board observed that respondent's illegal motivation was also inferable from the precipitate manner in which respondent effected the change-over to the independent contractor system.[8] We do not think that, because the respondent accelerated the change-over in order to avoid anticipated union interference, it necessarily follows that the original decision to change was to defeat union organizational efforts. It is the motive for the decision to change-over that is material to this controversy rather than the motive for accelerating the change-over.

(d) The background evidence of anti-union hostility consists of similar warnings and interrogations of employees in October, 1948, when the question of organizing a union was discussed. These statements made in 1948 are too remote and unrelated to have much probative force on the issue of respondent's motivation in making the change-over in 1950. That holds true also as to the point urged by respondent in refutation of any alleged anti-union animus, viz.: that it had for a long time bargained successfully with other unions.

Finally, to sustain the Board's finding that the change was illegally motivated, the petitioner argues that to show that evidence is capable of disparate interpretation is to show a reason for confirming, not displacing, the inference reasonably drawn by the Board. "Nor does it mean that even as to matters not requiring expertise a court may displace the Board's choice between two fairly conflicting views, even though the court would justifiably have made a different choice had the matter been before it *de novo*." Universal Camera Corp. v. N. L. R. B., 340 U.S. 474, 488, 71 S.Ct. 456, 465, 95 L.Ed. 456. The Board's view does not fairly conflict with ours, when it is not supported by substantial evidence on the record considered as a whole. Sec. 10(e) of the Act, [29 U.S.C.A. § 160(e)]. When the Board could as reasonably infer a proper motive as an unlawful one, substantial evidence has not proved the respondent to be guilty of an unfair labor practice. Motives are notoriously susceptible of

8. The following paragraph is quoted from the Board's opinion:

"Our finding of a causal relationship between the union activities and the change-over also finds support in the precipitate manner in which it was accomplished. The Respondent's haste, and its consequent neglect of important aspects of the new system, show something less in execution than a long-considered and carefully evolved business plan would normally require. The contractor started work under quickly drawn agreements which left the critical element of their pay rates entirely open, because, as Anderson testified, 'that took quite a bit of calculations.' He merely assured the men that while he could not tell what their rate would be, they would get 'a fair shake.' It is difficult to perceive how cost savings could have been an important factor when the Respondent did not even know, when it made the change, exactly how much the independent contractors were to be paid. Blue Bonnet Express Company, which was to haul the newspapers in place of the discharged employees, was pressed into service with the Respondent's trucks on lease. It furnished services under an oral 'gentlemen's agreement,' and no written contract was made until about 10 days later. During the first month after the change, the Respondent continued to issue carrier and dealer bills, cutting its name from old bill forms. For the remainder of October, the contractors were permitted to keep the money collected from the newsboy carriers, in addition to the newly established contractor payments."

being misunderstood and hard to prove or to disprove. If an ordinary act of business management can be set aside by the Board as being improperly motivated,[9] then indeed our system of free enterprise, the only system under which either labor or management would have any rights, is on its way out, unless the Board's action is scrupulously restricted to cases where its findings are supported by substantial evidence, that is evidence possessed of genuine substance. In our opinion, this is not such a case.

 (2) The petitioner urges that the Board properly found that respondent's conduct amounted to threats and interrogations of its employees in violation of Section 8(a)(1) of the Act. The evidence on this subject has already been discussed insofar as it is relevant to the motive for the change. Most of the statements, we think, were by minor supervisory employees merely expressing their personal opinion, and the statements charged to Anderson, under the circumstances made, do not exceed the limits of allowable free speech.

(3) By mutual agreement the first bargaining conference was set for October 21, 1950. The respondent then refused to bargain with the union for any unit of employees which included the district managers claiming that they were no longer in its employ. Whether that was a valid reason depends upon whether the district managers had been discriminatorily discharged. In our opinion, their services were validly terminated when the respondent, in the exercise of its business judgment, instituted the independent contractor system of distribution.

(4) It is not necessary to consider the question of validity of the Board's order requiring respondent to re-establish the district manager system since, in our

opinion, its findings that the respondent was guilty of unfair labor practices are not supported by substantial evidence on the record considered as a whole. Enforcement of the order is therefore

Denied.

---

9. The Board recognizes that it has no authority under ordinary circumstances to direct the Chronicle how to run its business:

"Of course, we do not presume to substitute this Board's judgment for that of the Respondent in matters of business practice, and it may well be that the contractor distribution system has advantages, for it does appear that some other newspaper companies use it. The sole question here is whether, on the record before us, the complaint allegation of discriminatory motivation has been proved."