**DAIRY, BAKERY and FOOD WORKERS LOCAL UNION NO. 386, etc.**

**v.**

**GRAND RAPIDS MILK DIVISION OF NATIONAL DAIRY PRODUCTS CORPORATION, a Delaware corporation.**

**Civ. A. No. 3375.**

United States District Court
W. D. Michigan, S. D.

Feb. 20, 1958.

A. L. Zwerdling, Zwerdling & Zwerdling, Detroit, Mich., for plaintiff.

John W. Cummiskey and Richard F. Hooker of McCobb, Heaney & Dunn, Grand Rapids, Mich., for defendant.

KENT, District Judge.

Plaintiff filed its complaint under Section 301 of the Taft-Hartley Act, being 29 U.S.C.A. § 185, which provides:

"(a) Suits for violation of contracts between an employer and a labor organization representing employees in an industry affecting commerce as defined in this chapter, or between any such labor organizations, may be brought in any district court of the United States having

jurisdiction of the parties, without respect to the amount in controversy or without regard to the citizenship of the parties."

Plaintiff also relies upon the Arbitration Act, which is 9 U.S.C. § 3, which provides:

"If any suit or proceeding be brought in any of the courts of the United States upon any issue referable to arbitration under an agreement in writing for such arbitration, the court in which such suit is pending, upon being satisfied that the issue involved in such suit or proceeding is referable to arbitration under such an agreement, shall on application of one of the parties stay the trial of the action until such arbitration has been had in accordance with the terms of the agreement, providing the applicant for the stay is not in default in proceeding with such arbitration."

Plaintiff prayed for a temporary restraining order and an injunction.

The temporary order was entered on February 10, 1958, restraining the defendant from selling or attempting to sell any of its retail milk routes. At the same time, the defendant was ordered to show cause why an injunction should not be entered requiring the defendant to submit the dispute between the parties to arbitration pursuant to the terms of the contract entered into on October 10, 1956, by the parties to this action.

For many years the defendant has been engaged in the dairy business in Grand Rapids, dealing in the processing, wholesale and retail distribution of milk and allied products in that city. In October, 1957, defendant began investigating the possibility of changing its operations by ceasing the retail distribution of milk for the stated purpose of more efficient and economic distribution of its products. It will cease the processing of milk in Grand Rapids on March 1, 1958, and concentrate its processing in a new plant in Lansing, Michigan.

On January 23, 1958, the defendant advised the union, plaintiff in this case, representing the employees of the defendant company, of its intention to sell its retail business, and offered its present employees an opportunity to buy the retail routes. The defendant stated that it intended to cease house-to-house distribution of milk on March 3, 1958, and further stated that it intended to ship milk from Lansing, thereafter, and sell it f.o.b. dock in Grand Rapids to independent contractors for distribution from house to house at such prices and on such terms to the consumer as the driver might fix with the consumer.

The plaintiff, representing defendant's employees, objected to defendant's plan, and on January 31, 1958, filed an unfair labor practice complaint with the National Labor Relations Board, alleging, and I quote:

"Since on or about January 28, 1958, the above named employer has bargained directly with employees exclusively represented by the undersigned union concerning the terms and conditions under which it proposes to terminate its operations and its employees' employment and other terms and conditions of employment including benefits and opportunities that will be afforded said employees upon such proposed termination, thereby undermining the undersigned labor organization and denying it the exclusive recognition it is entitled to by law."

On February 7, 1958, the defendant reiterated its position with regard to its plan to sell a part of its business and its claimed right to do so. On the same day, defendant posted a notice concerning "Discontinuance of Retail Routes." On February 10, 1958, plaintiff filed its complaint with this court.

Basically, the plaintiff claims that defendant is "discontinuing employment" and "discharging employees" within the meaning of the contract between the parties. Defendant takes the position that it is performing management's inherent function of conducting its business in the most efficient and economical manner possible. Defendant claims that

management has an inherent right to terminate a portion of its operations and have such work done by independent contractors unless specifically prohibited from so doing by the terms of the contract with the union.

The contract of October 10, 1956, recognized the plaintiff as the exclusive bargaining agent for all of defendant's employees. Those portions of the contract which seem most pertinent are as follows.

The preamble states:

"Whereas, it is considered to be to the mutual interest and is the desire of the parties hereto to stabilize employment, eliminate strikes, boycotts, lockouts and discontinuance of employment; and to secure a closer cooperation between the Company and its employees."

Further, under Article I it is provided, in part, that:

"The Company * * * shall negotiate with the duly authorized representatives thus chosen by its members for the purpose of adjusting any disputes which may arise concerning wage rates, working conditions, hours of employment, dismissals and discriminations and shall adjust any grievances or complaints which may now exist or may hereafter arise, on any matter affecting the welfare of the employees in the course of their employment."

Section 2 of that same article provides that:

"The Company agrees that it will not, through its officers or agents, negotiate with any other Union, individual or group of individuals, concerning the subject matter of this contract * * * The Company further agrees that no employee will be required or asked to make any verbal or written contract which conflicts with this Agreement * * *"

And Article II, Section 1, referring to the Grievance Committee, provides:

"The Committee, subject to the limitations and procedure hereinafter described, shall conduct grievance meetings and settle all grievances with the Company, and the Company agrees to meet and negotiate with said Grievance Committee on all matters and disputes arising under this Agreement."

Article VI, Section 2, having to do with general working conditions, provides, near the end of that section:

"It is the intention of this Agreement that as long as there is sufficient work to be done consistent with efficient operation and the employee is doing it efficiently and satisfactorily, he will not be laid off. The Grievance Committee shall be notified at the time of the discharge of any member. The Company agrees to notify the Grievance Committee before the abolition or discontinuance of any job or operation."

And, finally, the arbitration provision of this contract, which is broader than is found in most contracts, provides:

"*Section 1.* In the event that any grievances, disputes or differences growing out of matters not specifically covered by this Agreement shall arise which cannot be adjusted by the Company and the Union, then such matters shall, at the request of either party hereto, be referred promptly to arbitration. The Arbitration Committee shall be composed of three members, one to be chosen by the Company and one to be chosen by the Union. The selection of two arbitrators shall be made promptly and within five days from the time that arbitration is requested. The two so chosen shall select the third arbitrator.

"The selection of the third arbitrator shall be made promptly and within two days of their first meeting. Should the two arbitrators first chosen fail to agree upon the third arbitrator within the two-day

period, then the dispute shall be arbitrated according to the rules and regulations, and by an arbitrator, selected in a manner prescribed by the American Arbitration Association. The written decision of the majority of said arbitrators shall be final and both parties agree to be bound thereby. Any matter so submitted to said arbitrators shall be decided by them within ten (10) days from the selection of the third arbitrator."

Section 2 of that article is not pertinent to this controversy.

It is the theory and claim of the plaintiff that the terms of this contract are so broad that the court must find that the parties contemplated that such a problem as above described shall be submitted to arbitration under the terms of the contract; that the defendant had surrendered its right to make any such decision to curtail its operations and had agreed to abide by the determination of a group of third parties as to the scope of its operations and its right to use the services of independent contractors.

Plaintiff relies on the decision of the United States Supreme Court in Textile Workers Union v. Lincoln Mills, 353 U.S. 448, at page 456, 77 S.Ct. 912, at page 917, 1 L.Ed.2d 972, where Mr. Justice Douglas, speaking for the court, stated:

"It seems, therefore, clear to us that Congress adopted a policy which placed sanctions behind agreements to arbitrate grievance disputes, by implication rejecting the common-law rule, discussed in Red Cross Line v. Atlantic Fruit Co., 264 U.S. 109, 44 S.Ct. 274, 68 L.Ed. 582, against enforcement of executory agreements to arbitrate. We would undercut the Act and defeat its policy if we read § 301 narrowly as only conferring jurisdiction over labor organizations.

"The question then is, what is the substantive law to be applied in suits under § 301(a)? We conclude that the substantive law to apply in suits under § 301(a) is federal law, which the courts must fashion from the policy of our national labor laws. See Mendelsohn, Enforceability of Arbitration Agreements Under Taft-Hartley Section 301, 66 Yale L.J. 167. The Labor Management Relations Act expressly furnishes some substantive law. It points out what the parties may or may not do in certain situations. Other problems will lie in the penumbra of express statutory mandates. Some will lack express statutory sanction but will be solved by looking at the policy of the legislation and fashioning a remedy that will effectuate that policy. The range of judicial inventiveness will be determined by the nature of the problem. See Board of Commissioners v. United States, 308 U.S. 343, 351, 60 S.Ct. 285, 288, 84 L.Ed. 313. Federal interpretation of the federal law will govern, not state law. Cf. Jerome v. United States, 318 U.S. 101, 104, 63 S.Ct. 483, 485, 87 L.Ed. 640. But state law, if compatible with the purpose of § 301, may be resorted to in order to find the rule that will best effectuate the federal policy. See Board of Commissioners v. United States, supra, 308 U.S. at pages 351–352, 60 S.Ct. at pages 288–289. Any state law applied, however, will be absorbed as federal law and will not be an independent source of private rights."

Plaintiff also relies on the allied cases decided that same day: General Electric Co. v. Local 205, United Electrical, Radio and Machine Workers of America, 353 U.S. 547, 77 S.Ct. 921, 1 L.Ed.2d 1028; and Goodall-Sanford, Inc., v. United Textile Workers of America, 353 U.S. 550, 77 S.Ct. 920, 1 L.Ed.2d 1031.

None of these cases were concerned with the right of an employer to terminate a part of its operations. At first glance, Goodall appears to cover such an issue, but is in reality concerned with the rights of employees to certain fringe benefits in the event of such termination.

None of the other cases cited by the plaintiff are controlling in this situation.

The Circuit Court of Wayne County, Michigan, in Dairy Workers v. Detroit Creamery Co., 38 LRRM 2303, was faced with exactly the same problem which faces this court and held, inter alia, as follows:

"Under the common law neither the union nor its members had any rights as to management or duration of employment and hence had no right to complain if the company discharged any employees and subcontracted work previously done by them. It therefore follows that if this right of management has been surrendered it must be found in the contract.

"The mere signing of a collective bargaining agreement does not deprive the company of its normal rights of management, and no intention to yield or impair such inherent managerial functions, including the right to subcontract, can be implied by such signing. Management may, if it chooses, restrict its freedom of action in this field, but its intention to yield its inherent prerogatives must be found in the agreement.

"The plaintiff in this action is not able to point to any specific provisions in the agreement wherein management has given up its right to subcontract. Counsel for the plaintiff talks about the area of collective bargaining under the Labor Management Relations Act. In my opinion that question is not before the court. The question before the court is whether or not management's right to sub-contract has been relinquished under this contract.

"Although counsel for the plaintiff cites a number of provisions in the contract, his argument is confined principally to two. The first is Article V, page 32, of the contract, which provides:

" 'It is the intention of this agreement that as long as there is sufficient work to be done, consistent with efficiency in operation, and the employee is doing it efficiently and satisfactorily, he will not be laid off.'

"I am unable to see how this prevents the company from sub-contracting when it will save them approximately $100,000.00 a year by so doing.

"The second provision in the contract cited by counsel is Article VI, Section 1, which provides:

" 'In the event any grievance, dispute or difference growing out of matters not specifically covered by this agreement shall arise which can not be adjusted by the company and the union, then such matter shall at the request of either party be referred promptly to arbitration * *'.

"I am sure counsel does not contend that this provision covers everything that may arise between the parties that is not covered by the contract. This could allow the union through arbitration to take over the entire concern. The only reasonable way it may be interpreted is that it applies only to matters covered by the contract, but not covered specifically or in detail, and as I have previously stated, counsel has not pointed out any provisions in the contract that in any way covers subcontracting.

"I have read the contract from beginning to end and I am unable to find any place in the contract where the company has given up its managerial right to sub-contract, nor confided to arbitrators the right to review their business judgment in abandoning a department."

The general rule that heed must be given to decisions by state courts other than the court of last resort of a state has been resolved on more than one occasion in the Sixth Circuit. In Gustin v. Sun Life Assur. Co. of Canada, 154 F.2d 961, 962, certiorari denied 328 U.S.

866, 66 S.Ct. 1374, 90 L.Ed. 1636, the Sixth Circuit Court of Appeals, in dealing with that problem, stated:

> "Moreover, in the instant case, the determining consideration was stated by the Supreme Court of the United States when it declared in West v. American Telephone & Telegraph Co., 311 U.S. 223, 225, 227, 61 S.Ct. 179, 183, 85 L.Ed. 139, that it is the duty of the federal courts 'in every case to ascertain from all the available data what the state law is and apply it rather than to prescribe a different rule * * *.'
>
> * * * * * *
>
> "We think we cannot ignore this data so definitely presented as to what the state law is upon the precise point at issue in the instant case. Paraphrasing the words of the Supreme Court in West v. American Telephone and Telegraph Co. * * * if the present suit had been brought in the Cuyahoga County Court, no reason is advanced for supposing that the Cuyahoga County Court of Appeals would depart from its previous ruling or that the Supreme Court of Ohio would grant the review which it withheld before."

And, further, in Continental Casualty Co. v. Ohio Edison Co., 126 F.2d 423, 426, the same court held:

> "In determining state law, the Federal Courts must look not alone to the opinions of the highest court of the state, for 'a state is not without law save as its highest court has declared it'; and 'a federal court is not free to reject the state rule merely because it has not received the sanction of the highest state court, even though it thinks the rule is unsound in principle or that another is preferable.'"

And attention, of course, is called to that historic case of Erie Railroad Co. v. Tompkins, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188.

■ This court is satisfied that the real problem in this case is to determine the intention of the parties and what was contemplated at the time the contract was executed. It would appear that the decision of the Wayne County Circuit Court should be controlling in this situation. If the statement of Mr. Justice Douglas in the Lincoln Mills case, "Any state law applied, however, will be absorbed as federal law and will not be an independent source of private rights," [353 U.S. 448, 77 S.Ct. 918] is followed literally, then we should also look to the decisions of the Sixth Circuit Court of Appeals to determine the solution of similar problems by that court.

Recently, that court stated, in affirming this court in a problem which had some similarity but which was based upon a different contract and upon different provisions in a contract, and I quote from the last paragraph of the decision, International Union, United Automobile Aircraft, etc., v. Benton Harbor Malleable Industries, 6 Cir., 242 F. 2d 536, 542:

> "There being nothing in the collective bargaining agreement which gives the appellants the right to submit to arbitration the question of its liability for the claimed breach of its no-strike obligation, the U. S. Arbitration Act has no application and the stay order was properly denied." Citing Hoover Motor Express Co. v. Teamsters, Chauffeurs, etc., 217 F.2d 49, at page 54, also a decision of the Sixth Circuit.

That same court has had occasion to speak on this subject in United States Steel Corporation v. Nichols, 229 F.2d 396, at page 399, where the court stated:

> "The Labor Management Relations Act in defining the phrase 'to bargain collectively' expressly provides * * * 'but such obligation does not compel either party to agree to a proposal or require the making of a concession.' Sec. 158(d), Title 29 U.S.C.A. It would seem to logically follow that the common law right on the part of the employer to select his employees and to terminate their employment at will con-

tinues to exist except to the extent that it may be modified by the bargaining contract with the Union. Instead of making this right dependent upon a provision to that effect in the contract, it is a right which an employer normally has unless it has been eliminated or modified by the contract. Accordingly, we are not in agreement with what we construe to be the District Judge's conclusion of law that since there was no provision in the collective bargaining contract authorizing the termination of appellee's employment by reason of age, such right did not exist.

"The District Judge reached that conclusion upon the theory that the bargaining agreement expressed the complete obligations and rights of the parties relating to employees, including conditions and tenure of employment, which in turn included termination of employment, and that the employer should not be permitted to withhold an undisclosed employment right not recorded or reserved by the agreement. Although it may be the theory of the law that collective bargaining may at times or eventually accomplish that result, the express language of the Labor-Management Relations Act, Sec. 158 (d), Title 29 U.S.C.A., and the authorities above referred to make it clear that a collective bargaining agreement does not necessarily express the full coverage of employment rights. It covers such matters only as the parties may have been able to agree upon and leaves unresolved such issues as the parties may not have been able to agree upon and with respect to which the law does not require a concession by either party."

And, further, at page 400 the court said:

"Accordingly, instead of searching for a provision in the contract authorizing termination of employ-ment by reason of age, we think it is necessary to determine from a consideration of the terms of the contract whether termination of employment by reason of age was prohibited by the contract." Citing N. L. R. B. v. Nash-Finch Co., 8 Cir., 211 F.2d 622, at pages 626 and 627, 45 A.L.R.2d 683. "This requires the application of the usual rules involved in the construction of a written instrument."

Attention is also called to National Labor Relations Board v. Adkins Transfer Company, 6 Cir., 226 F.2d 324, at page 327, where the court said:

"A company may suspend its operations or change its business methods so long as its change in operations is not motivated by the illegal intention to avoid its obligations under the Act. National Labor Relations Board v. Houston Chronicle Pub. Co., 5 Cir., 211 F.2d 848. An employer may discharge or refuse to reemploy one of his employees for any reason, just or unjust, except discrimination because of union activities and relationships, and the controlling and ultimate fact which determines an issue of the kind here presented is, what was the true reason back of the discharge."

The court further says, at page 328:

"Evidence that particular jobs had been discontinued and that no replacement employees have been hired tends to show that the discharges were not discriminatory * * * The crucial and controlling fact is what was the true reason back of the discharge."

And, further, the court said on the same page:

" * * * where an employer elected to discontinue a branch office business but continued to retain other departments of the business, a union which commenced picketing for the purpose of compelling him to reopen the discontinued business

was enjoined in a decision in which the court stated, in its opinion: "—citing a New York case—" 'When the plaintiff elected to discontinue his factory no one was privileged to complain *even though it was done deliberately to avoid a labor dispute*. It may be unfortunate and regrettable that because of such decision willing workers are rendered idle and unhappy. When the question of the legality of an act is alone involved, the law is indifferent to the result thereof. If plaintiff had the right to close down his factory the fact that a number of people are foreclosed of employment cannot govern or limit the exercise of that right by him.' (Emphasis supplied.)"

There is no evidence and little if any claim on the part of the plaintiff that the defendant here reached its decision to terminate its retail routes for any reason except that stated. Therefore, this court's conclusions are:

First, that the parties hereto did not contemplate the termination of retail distribution by defendant at the time the contract was executed.

Second, that the reasons which motivated the decision of the defendant to terminate the retail distribution of milk were in no sense illegal.

Third, that the determination of the scope of defendant's operations is an inherent function of management unless otherwise specifically provided by contract.

Fourth, that the defendant did not surrender its right to determine the scope of its operations by any provision in the contract of October 10, 1956.

Fifth, that the parties' contract requires submission to arbitration only of those matters contemplated by the contract of October 10, 1956.

Sixth, that the decision of the defendant to terminate the retail distribution of milk is not an arbitrable matter under the contract provisions.

For the reasons herein stated, the temporary restraining order heretofore entered is dissolved, and plaintiff's prayer for an injunction and for an order requiring the defendant to submit this matter to arbitration is denied.